[Cite as *Parma v. Fonte*, 2013-Ohio-3804.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99147**

## CITY OF PARMA

PLAINTIFF-APPELLEE

vs.

## JOHNATHAN D. FONTE

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Parma Municipal Court
Case No. 12 CRB 00921

**BEFORE:** Jones, P.J., S. Gallagher, J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:** September 5, 2013

**ATTORNEY FOR APPELLANT**

Jonathan N. Garver
4403 St. Clair Avenue
The Brownhoist Building
Cleveland, Ohio 44103


**ATTORNEYS FOR APPELLEE**

Timothy G. Dobeck
Director of Law

BY: Richard A. Neff
Assistant County Prosecutor
City of Parma
5555 Powers Boulevard
Parma, Ohio, 44129

LARRY A. JONES, SR., P.J.:

{¶1} Defendant-appellant, Jonathan Fonte, appeals his menacing conviction that was rendered after a bench trial. We affirm.

I.    Procedural History

{¶2} In October 2011, Fonte was charged with aggravated menacing and telephone harassment in another, but related case (Case No. 11 CRB 04692). A public defender was appointed to represent Fonte. At the first pretrial hearing, held in January 2012, Fonte requested a different public defender; the request was denied.

{¶3} In February 2012, Fonte was charged with menacing and telephone harassment in this case. The pretrial proceedings for this case and the first case were consolidated, and the same public defender was also assigned to represent Fonte in this case.

{¶4} Relative to this case, Fonte executed a waiver of right to speedy trial in March 2012. In May 2012, Fonte, pro se, filed a motion to dismiss based on speedy trial grounds; the motion was denied, as was Fonte's pro se motion for reconsideration.

{¶5} In September 2012, the matter was heard in a trial before the bench. The court found Fonte guilty of menacing, a misdemeanor of the fourth degree, but not guilty of telephone harassment. The trial court sentenced Fonte to a 30-day jail term, with credit for one day served, and suspended the remaining 29 days. The court further imposed a $250 fine, but suspended it. The court placed Fonte on community control sanctions.

**{¶6}** The other case (Case No. 11 CRB 04692) was dismissed.

## II. Facts

Public Defender's Representation

**{¶7}** The issue of the public defender's representation of Fonte was discussed at the first pretrial on the first case. The record demonstrates that the attorney had previously represented Fonte, his brother, and his father. Fonte expressed to the court that the attorney had, in the past and recently relative to Case No. 11 CRB 04692, made insulting remarks to him and his family. Fonte said that in regard to his representation on that case, the public defender told him that he (Fonte) did not know how to speak and he thought he knew everything. The attorney responded that he was reading the transcript (presumably of the alleged menacing phone call).

**{¶8}** Fonte also told the court that the attorney told him he did not like him. The public defender responded, "I don't like him. Your Honor I don't like him. Mr. Fonte has been in prison and I don't like him." The trial court responded that the public defender does not pick his clients and, therefore, "[t]here are people I'm sure he may not like but he still represents them and represents them well whether it's in Pretrial or Trial."

**{¶9}** The trial court explained that the city of Parma had one public defender and, consequently, any defendant who qualified for and wished to be represented by a public defender, would get that attorney. The court told Fonte that if he did not wish to proceed with the public defender, he could hire his own attorney or represent himself.

The court reiterated the following:

> [y]ou may not like your Attorney but he will still give you good representation because in the 24 years that I've been here and years before that when I was practicing, he does a good job.

Trial Testimony

{¶10} The victim in this case was Julia Ruane, assistant dean of student affairs at Cuyahoga Community College ("Tri-C") western campus in Parma. Dean Ruane testified that in February 2012, Fonte contacted Tri-C's enrollment center regarding re-admission after he had been dismissed on academic grounds. Fonte was not satisfied with the response from the enrollment center, so Ruane contacted him at the center's request. At the time, Fonte had been accepted for re-enrollment for two classes in the summer semester, but he wanted his re-enrollment to be full time, and begin immediately in the spring semester that was then underway.

{¶11} Dean Ruane testified that when a student was readmitted under the circumstances such as Fonte was, it was the college's policy that he be limited to two courses; further, there were limits on which two courses. The courses that Fonte needed to take were not being offered at the time he desired to start.

{¶12} Dean Ruane testified that she initiated her conversation with Fonte by stating that she understood he had some concerns with his re-enrollment for the summer semester. She testified that the tone of the call was then set as Fonte became "pretty angry insisting that it was not for the Summer Semester, but was for the Spring Semester * * *." Fonte told her that he needed to start immediately because he had other plans for

the summer.

{¶13} Ruane testified that she explained to Fonte that because he had been academically dismissed, the school was concerned that he "come back in a manner that allowed him to be successful," and the classes he was limited to taking were not then available.

{¶14} The dean testified that Fonte started yelling that she was a "freaking idiot" who did not know what she was talking about and that he had to come back right away, and full time so that he could get financial aid. Ruane testified that Fonte was using profanity and she asked him to calm down and told him she was trying to help him. Fonte responded that he did not care if she was trying to help him, he did not believe her, and he was going to make her "sorry" or "make her pay" because he was a "mentally ill person" and she was being "cruel and uncaring."

{¶15} When asked how she perceived Fonte's comments, Dean Ruane testified as follows:

> I felt that he was threatening my personal well being. I talk with a lot of students and they're quite often angry, they're not happy about something, but usually they don't, I have not in the time that I've been doing this job, ever have a student say they would make me pay, they would make me sorry, so I did take it to mean that he was physically threatening me.

The dean testified that she thought Fonte was "serious" about his threats to "make her pay," and she was "unnerved" by it.

{¶16} Ruane, trying to work with Fonte, told him that she might be able to see if she could make an exception and find a class that he could take in the spring semester, but

Fonte responded that he wanted to be full time and told Ruane that he could tell she thought he was "bluffing," but he was not. The conversation ended with Fonte requesting to speak with the dean of the entire school and then hanging up on Ruane.

{¶17} When first asked, on direct examination, if she was so unnerved that she called the police, Dean Ruane responded,

> [a]ctually I did not call campus police, my office mate who is in the next office overheard the yelling and became concerned for my welfare and called campus police and then I spoke with campus police about what transpired.

The dean testified that she had had Fonte on speaker phone, which she usually does so that she can look up information while she is speaking with the student.

{¶18} As a result of the incident, while on campus the dean received security escorts and parking in a more secure place.[1] Ruane contacted the local police where she resided to apprise them of the incident. The trial court also granted her a temporary protection order against Fonte. Ruane testified that, at the time of trial, which was approximately seven months after the incident, she still had a "few sleepless nights," and was still "just a little nervous about things."

{¶19} On cross-examination, the public defender questioned Dean Ruane about the statement she gave to the college police, that stated that Fonte was screaming that he was going to call the governor of Ohio, President Obama, Channel 19 News, and a lawyer. Ruane further indicated in her statement that Fonte told her he would sue the college and

---

[1] In fact, all of the deans in Ruane's building were given more secure parking spaces as a result of the incident.

her personally.  The statement also indicated that Fonte made other statements such as saying she did not want to "mess" with a mentally ill person, and that he would "make her pay" or "make her sorry."

{¶20} Dean Ruane's co-worker who called campus security, Joy Fejes, testified that Ruane was on speaker phone with Fonte and she heard things "getting loud" so she went to the dean's office to investigate.  Fejes heard Fonte tell Ruane that he was mentally ill and she did not want to "mess" with a mentally ill person.  Fejes testified that she interpreted the statement as a threat to the dean's physical safety or well being. Fejes, therefore, called campus security.

{¶21} After the city rested its case, the defense presented testimony.  First, Fonte's grandmother testified.  The grandmother testified that she was with Fonte during the telephone conversation with Dean Ruane.  She testified that Fonte told Ruane that he wanted to start his classes, and then he got upset and told Ruane that he would sue her, call the media, and write to the governor and president.  The grandmother heard Fonte say that he was mentally ill, but denied hearing him say anything to the effect of "you will be sorry."  The grandmother testified that Fonte was speaking loudly, but that was they way he always spoke.

{¶22} Second, Fonte testified.  According to Fonte, after he explained his situation to Dean Ruane, she told him that she would not help him, and no one else could.  In response, Fonte told the dean that he was going to sue her and Tri-C.  Fonte testified that he told Ruane that he was "mentally disabled" and he was going to expose this

perceived injustice to the media and write to the president of the United States and the Ohio governor.

{¶23} Fonte denied telling Ruane that she would be sorry or speaking profanely to her. He testified, "[w]hen I speak to people of authority I control my words and I restrain myself from being that type of disrepectfulness [sic] because I don't want to be disrespected in that manner either." Fonte testified that he was only trying to communicate to Ruane that there would be legal repercussions if the college did not help him. According to Fonte, the call ended somewhat agreeably, with Ruane finally saying that she would see what she could do and get back in touch with him. They said goodbye to one another and hung up.

{¶24} On cross-examination, Fonte admitted that he was a convicted felon, with his most recent conviction being for retaliation.

{¶25} Fonte now raises the following assignments of error for our review:

I. The evidence is insufficient to support Appellant's conviction for menacing.

II. Appellant's conviction for menacing is against the manifest weight of the evidence.

III. The trial court denied Appellant due process of law and the right to the effective assistance of counsel by failing to make adequate inquiry into Appellant's request to discharge his court-appointed counsel and by refusing to consider the appointment of substitute counsel. *Sixth, and Fourteenth Amendments, Constitution of the United States; Article I, §10 and §16, Constitution of the State of Ohio.*

IV. Appellant was denied the right to the effective assistance of counsel in violation of the Sixth Amendment to the Constitution of the United States and Article I, Sections 2 and 10 of the Constitution of the State of Ohio.

V. Appellant's conviction for menacing violates his right to freedom of speech and his right to petition the government for redress of grievances guaranteed by the First Amendment to the Constitution of the United States and Article I, Sections 3 and 11 of the Constitution of the State of Ohio.

VI. *Ohio Rev. Code §2903.22* is unconstitutionally indefinite and vague and, therefore, violates the due process clause of the Fourteenth Amendment to the Constitution of the United States and Article I, Section 16 of the Constitution of the State of Ohio.

(Emphasis sic.)

### III.   Law and Analysis

Sufficiency of the Evidence

{¶26} For his first assigned error, Fonte contends that the evidence was not sufficient to support the menacing conviction.

{¶27} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, an appellate court does not conduct an exhaustive review of the record, or a comparative weighing of competing evidence, or speculation as to the credibility of any witnesses. Instead, the appellate court presumptively "view[s] the evidence in a light most favorable to the prosecution." *Jenks* at 274.

{¶28} R.C. 2903.22, governing menacing, provides that "[n]o person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person * * *."   R.C. 2903.22(A).

{¶29} According to R.C. 2901.22(B), "a person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.   A person has knowledge of the circumstances when he is aware that such circumstances probably exist."

{¶30} Physical harm to persons means "any injury, illness, or other physiological impairment, regardless of its gravity or duration."   R.C. 2901.01(A)(3).

{¶31} Fonte contends that the only threat he made to Dean Ruane was to sue her and the college, notify the media, and write a letter to the president of the United States and the governor of Ohio.   He likens this case to *In the Matter of: Samantha Cunningham*, 7th Dist. Harrison No. 02-537-CA, 2002-Ohio-5875.

{¶32} In *Cunningham*, Cunningham, a juvenile, was charged with three counts of aggravated menacing[2] after two letters were discovered at her school.   Cunningham was convicted of aggravated menacing based on the contents of one of the letters ("letter no. 1"), which the state proved she authored.   The letter contained references to two teachers and read in relevant part as follows: "* * * so from here on out we're going to try to make your life hell! * * * and we know where those [b* * * * * * ]mentioned earlier live * * *

---

[2] Aggravated menacing requires "serious" physical harm to persons or property, while menacing just requires harm to persons or property.   *See* R.C. 2903.21(A) and 2903.22(A), respectively.

so when you hear noises at night * * * it's not just 'nothing' * * * it'll be us! * * *."
(Emphasis sic.)  *Id.* at ¶ 39.

**{¶33}** The other letter ("letter no. 2") was not admitted into evidence, it was not proven that Cunningham authored it, and the testimony regarding it was scant.  As noted by the Seventh District, the state's "theory of the case appeared to be that [Cunningham] committed aggravated menacing in authoring and distributing Letter No. 1."  *Id.* at ¶ 3. As such, in convicting Cunningham, the trial court focused exclusively on letter no. 1.

**{¶34}** The Seventh Appellate District reversed Cunningham's aggravated menacing conviction, finding that the letter was "primarily an emotional outburst" with "rude, boisterous and insulting words."  *Id.* at ¶ 41.  Further, the court found that the evidence did not show that the victims actually believed that they would suffer serious physical harm.

**{¶35}** One of the teachers testified that the letter made her "apprehensive," "disappointed," and that she felt "astonishment."  And although the other teacher testified about her fear of specific examples of serious physical harm that could have been intended (being ambushed or stabbed, for example), the Seventh District found that those fears were based on letter no. 2.  The court held that the teacher's fears were not "rationally or reasonably inferred from Letter No. 1," and, therefore, reversed Cunningham's conviction.  *Id.* at ¶ 44.

**{¶36}** This case is distinguishable from *Cunningham.*  First, Fonte's words to Ruane that he was going to make her "sorry" or "make her pay" because he was a

"mentally ill person" and she was being "cruel and uncaring," could reasonably be construed to constitute more than a threat to sue her, the college, and write the president and governor, and more than just rude or insulting.

{¶37} Second, the dean in fact thought Fonte was "serious" about his threats to "make her pay," and was "unnerved" by it — she believed he was threatening physical harm to her. Following the incident, she contacted the police in the community where she resided to apprise them of the incident. At trial, which was approximately seven months after the incident, Ruane testified that she still had a "few sleepless nights," and was still "just a little nervous about things." Moreover, campus security implemented measures for not only Ruane's safety, but also for the safety of all the deans with offices in her building.

{¶38} Third, the incident was, at least in part, witnessed by another person, Ruane's co-worker, Joy Fejes, who went to investigate when she heard the conversation "getting loud." After hearing Fonte's statement to Ruane that he was mentally ill and she did not want to "mess with a mentally ill person," Fejes called campus security because she believed the statement was a threat to the dean's physical safety or well being.

{¶39} For the above-mentioned reasons, this case is distinguishable from *Cunningham*. Moreover, we also find distinguishable two other cases cited by Fonte: *State v. Beckwith*, 8th Dist. Cuyahoga No. 98497, 2013-Ohio-492, and *Cleveland Hts. v. Lewis*, 8th Dist. Cuyahoga No. 79511, 2002-Ohio-2736.

**{¶40}** In *Beckwith*, the defendant was convicted of menacing by stalking based on the victim's testimony that Beckwith "creeped her out" by following her while she worked as an employee of a public library. The defendant only spoke to the victim twice, each time relative to her capacity as a library employee. After the victim voiced several complaints to supervisors, security for the library told Beckwith that he was no longer welcome at the library; Beckwith did not return, although the victim testified that she had two encounters with him after that near the library.

**{¶41}** At issue was whether the state presented sufficient evidence to demonstrate that Beckwith's actions caused the victim mental distress. This court found that the state had not, noting that Beckwith made the victim "uncomfortable," but did not knowingly cause her mental distress.

**{¶42}** In *Lewis*, this court reversed Lewis's menacing by stalking conviction, finding that the state failed to present sufficient evidence that Lewis had caused mental distress to the victim, his ex-wife. The ex-wife testified that three years after they had been divorced, on a weekend when Lewis was exercising his visitation rights at his home with the parties' three teen-aged children, he called her numerous times at her home, upset about a new relationship she was in.

**{¶43}** When questioned about how the calls caused her mental distress, the ex-wife testified as follows:

> I was upset because my children were with him at the time that he made the calls. And in the past when [Lewis] and I would have problems, they seemed to catch the brunt of it. They would have to basically — I guess what I'm trying to say, he would take his frustration out on them if

something — a place where they needed to go or they wanted to go, maybe they would not be able to go because he was upset with me.

*Id.* at ¶ 18.

**{¶44}** The ex-wife testified that the circumstance made her worry about her children. The above-mentioned was the extent of the state's evidence regarding the ex-wife's claim of mental distress. This court held that the testimony did not demonstrate that the victim had suffered a "'temporary, substantial incapacity or mental illness or condition that would normally require psychiatric treatment,'" as required for a menacing by stalking conviction. *Id.* at ¶ 25, quoting R.C. 2903.211(D)(2).

**{¶45}** Unlike Beckwith and Lewis, Fonte made statements to Ruane that could reasonably be interpreted as threats of harm, and Ruane, in fact, perceived them as such. The threats constituted more than a fleeting moment of worry. They resulted in a third party, Fejes, calling campus security, and campus security taking measures beyond the day of the incident to ensure Ruane's safety, as well as Ruane notifying the police in the community where she resided.

**{¶46}** In light of the above, the state presented sufficient evidence to sustain the menacing conviction and the first assignment of error is, therefore, overruled.

Manifest Weight of the Evidence

**{¶47}** For his second assigned error, Fonte contends that his conviction was against the weight of the evidence.

**{¶48}** When presented with a challenge to the manifest weight of the evidence, an

appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.   *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶49} An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "'exceptional case in which the evidence weighs heavily against the conviction.'"   *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶50} Fonte contends that the weight of the evidence does not support the conviction for the following reasons: (1) the evidence failed to demonstrate that Fonte threatened physical harm to Ruane; (2) Ruane's uncertain testimony; and (3) Ruane's lack of credibility.

{¶51} Regarding whether the evidence showed that Fonte threatened physical harm to Ruane, the trial court's finding that he did is not so incredible so as to warrant a new trial.   The testimony could reasonably be construed to demonstrate that Fonte was threatening to do more than sue Ruane and the college and write the president and the governor.

{¶52} In regard to Fonte's contention that Ruane's testimony was uncertain and lacking in credibility, we emphasize that an appellate court "may not reverse the judgment

of conviction unless reasonable minds could not fail to find reasonable doubt of the defendant's guilt. It is fundamental that the weight to be given the evidence and credibility of the witnesses are primarily for the trier of facts." *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982).

{¶53} There was nothing so incredible about Ruane's testimony that would lead us to reverse. We are not persuaded that the trial court was misled by the city's alleged attempt to portray that Ruane was the one who called campus security. On direct examination, the assistant city prosecutor did ask Ruane if she was so unnerved by the incident that she called campus security; Ruane answered as follows, making it clear that she did not call campus security: "[a]ctually I did not call campus police, my office mate who is the next office over heard the yelling and became concerned for my welfare and called campus police and then I spoke with campus police about what transpired."

{¶54} Likewise on cross-examination, Ruane testified that her "office coordinator contacted campus police." Moreover, the officer coordinator, Fejes, testified that she, Fejes, called campus security. On this record, there was no "misleading" the trial court into losing its way.

{¶55} Further, we do not find that Ruane's testimony was equivocal because at one point she stated "I don't know, I just felt like he might be threatening me physically." When Ruane's testimony is read as a whole, it is clear that she felt threatened by Fonte.

{¶56} We also do not find that the dean's testimony was discredited because she did not testify at trial about certain statements she recounted to campus security that Fonte

had made (suing her and the college, calling the media, and writing to the president and governor). Both the statement and the testimony contained what Ruane construed to be the threat of physical harm to her, that is, that Fonte would make her pay or be sorry because she was being uncaring and cruel to a mentally ill person.

{¶57} On this record, the menacing conviction was not against the weight of the evidence and the second assignment of error is, therefore, overruled.

Inquiry into Fonte's Request for New Counsel

{¶58} For his third assigned error, Fonte contends that the trial court did not make adequate inquiry into his request for a new attorney pursuant to *State v. Deal*, 17 Ohio St.2d 17, 244 N.E.2d 742 (1969).

{¶59} In *Deal*, the Ohio Supreme Court held that,

> [w]here, during the course of his trial for a serious crime, an indigent accused questions the effectiveness and adequacy of assigned counsel * * * , it is the duty of the trial judge to inquire into the complaint and make such inquiry a part of the record.

*Id.* at syllabus. However, the "limited judicial duty arises only if the allegations are sufficiently specific; vague or general objections do not trigger the duty to investigate further." *State v. Carter*, 128 Ohio App.3d 419, 423, 715 N.E.2d 223 (4th Dist.1998), citing *Deal* at 19.

{¶60} Fonte's request for new counsel was based on the public defender's alleged bias against Fonte and his family. The public defender admitted that he did not like Fonte; he recalled that he had previously represented Fonte's father, but had not had contact with him for 30 years. The trial court explained that Fonte and his attorney did

not have to like one another, and that in his years of experience, the public defender provided good representation to all his clients. The trial court provided Fonte with the options of retaining counsel or representing himself.

**{¶61}** An indigent defendant's right to counsel does not extend to counsel of the defendant's choice. *Thurston v. Maxwell*, 3 Ohio St.2d 92, 93, 209 N.E.2d 204 (1965). Further, an indigent defendant's right to counsel does not mean that appointed counsel must develop and share "a meaningful relationship" with his client. *State v. Blankenship*, 102 Ohio App.3d 534, 558, 657 N.E.2d 559 (12th Dist.1995), citing *Morris v. Slappy*, 461 U.S. 1, 13, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). Grounds for obtaining newly appointed counsel exist only upon "a showing of good cause, such as a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict which leads to an apparently unjust result." *Blankenship* at 558, citing *State v. Pruitt*, 18 Ohio App.3d 50, 57, 480 N.E.2d 499 (8th Dist.1984).

**{¶62}** In *State v. Hawkins*, 8th Dist. Cuyahoga No. 91930, 2009-Ohio-4368, Hawkins requested new counsel on the day his case was set for a change of plea hearing because he believed his lawyers were "not going to fight for [him] to the fullest extent." *Id.* at ¶ 13. The trial court told Hawkins that the two assigned lawyers he had were "above reproach, and certainly two of the finest lawyers you could have to represent you." *Id.* at ¶ 15. The court then informed Hawkins as follows:

> Whether or not you like the answers they give you, Mr. [Hawkins], is not at issue. They both know their business. They both will fight hard for you at trial, and they will do their best to represent you in accordance with their cannons of ethics and code of responsibility, zealously represent you. So

that's not an issue.

You're going to trial today or you're going to enter a plea of guilty today.

*Id.* at ¶ 16-17.

**{¶63}** This court held that because Hawkins's request for new counsel was made on a general, rather than specific, ground, the trial court did not have a duty to inquire further into his request. *Id.* at ¶ 60. But this court also added the following:

> We note, however, that the better practice would have been for the trial court to conduct a minimal inquiry regarding Hawkins's concerns. This would have permitted the trial court to quickly dispose of any nonmeritorious claims and would have resulted in a more complete record on appeal. However, under the specific facts and circumstances in this case, the trial court did not err by not conducting such an inquiry.

*Id.* at ¶ 61.

**{¶64}** Likewise, upon review here, although it would have been the better practice to conduct a minimal inquiry of Fonte's request for new counsel, we find that the trial court did not have a duty to further inquire. Fonte's request for new counsel was vague — the public defender did not like him or his family — and, therefore, did not require any more inquiry than was afforded. Fonte did not articulate to the trial court specific examples of how his attorney not liking him was detrimental to his defense (such as a complete breakdown in communication, for example). Moreover, Fonte was convicted of one of the two charges, and sentenced to probation, which on this record does not demonstrate that any conflict he and his attorney had led to an unjust result.

**{¶65}** In light of the above, the third assignment of error is overruled.

Ineffective Assistance of Counsel

{¶66} In his fourth assignment of error, Fonte contends that he was denied his right to effective assistance of counsel because his counsel (1) had a conflict of interest; (2) had an animus toward him; (3) failed to make an opening statement; (4) failed to make a Crim.R. 29 motion for acquittal; and (5) failed to file a pretrial motion to dismiss. Fonte further contends that the cumulative effect of these alleged errors demonstrate counsel's ineffectiveness.

{¶67} To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradely*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. A defendant must show that counsel acted unreasonably and that, but for counsel's errors, there exits a reasonable probability that the result of the proceeding would have been different. *Strickland* at 696; *Bradley* at paragraph three of the syllabus. We will briefly consider Fonte's claims against this standard.

1.   Conflict of Interest

{¶68} The Sixth Amendment to the United States Constitution guarantees that representation shall be free from conflicts of interest. *State v. Dillon*, 74 Ohio St.3d 166, 167, 657 N.E.2d 273 (1995). In order to establish a Sixth Amendment violation due to a conflict of interest, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v.*

*Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

**{¶69}** "An actual conflict of interest exists if, during the course of the representation, the defendants' interests * * * diverge with respect to a material factual or legal issue or to a course of action * * *." *State v. Rogers*, 4th Dist. Adams No. 548, 1994 Ohio App. LEXIS 1270 (Mar. 23, 1994) (discussing joint representation of criminal defendants). A potential conflict of interest exists "* * * where the 'interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties.'" *State v. Gillard*, 78 Ohio St.3d 548, 552, 679 N.E.2d 276 (1997), quoting *Dillon* at 168. In other words, a lawyer represents conflicting interests "when, on behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." *Id.*, citing *State v. Manross*, 40 Ohio St.3d 180, 182, 532 N.E.2d 735 (1988).

**{¶70}** Fonte's claims that a conflict existed because the public defender had previously represented his father on charges of domestic violence or child endangerment in which Fonte was one of the victims. Counsel acknowledged that he had represented the father 30 years ago. But that representation in and of itself did not create a conflict for counsel representing Fonte in this case. And on this record, we find no actual or potential conflict of interest interfered with trial counsel's effective representation of Fonte.

2.   Animus

**{¶71}** In regard to counsel's dislike for Fonte, as previously discussed, Fonte was not entitled to a court-appointed attorney of his choosing, or even one who liked him.

On the record before us, we do not find that counsel's performance was deficient, or that Fonte was prejudiced by his representation. For example, counsel zealously cross-examined Dean Ruane in an attempt to test her credibility and show that this was an isolated incident and part of her job was dealing with "angry" students. He also obtained a favorable end result for Fonte.

3. Failure to make an Opening Statement

{¶72} Both the city and the defense waived opening statements. Fonte now contends, without any explanation as to how, that counsel was ineffective for this waiver. Waiving opening statement is not in and of itself ineffective assistance of counsel. *State v. Norman*, 8th Dist. Cuyahoga No. 80702, 2002-Ohio-6043, ¶ 51. This matter involved an uncomplicated fact pattern with one defendant, and it was tried to the bench. On review, an opening statement would not have aided Fonte's cause.

4. Failure to make a Crim.R 29 Motion for Acquittal

{¶73} Defense counsel did not make a Crim.R. 29 motion for acquittal at the close of the city's case or the close of the presentation of all the evidence. Fonte now claims that his counsel's failure to do so was ineffective.

{¶74} The Ohio Supreme Court has held the following with regard to a Crim.R. 29 motion in a bench trial:

> The purpose of a motion for judgment of acquittal is to test the sufficiency of the evidence and, where the evidence is insufficient, to take the case from the jury. In the non-jury trial, however, the defendant's plea of not guilty serves as a motion for judgment of acquittal, and obviates the necessity of renewing a Crim.R. 29 motion at the close of all the evidence. *See* the following cases decided under the analogous Fed.R.Crim.P. 29:

> *Hall v. United States* (C.A. 5, 1961), 286 F.2d 676, 677, certiorari denied, 366 U.S. 910; *United States v. Besase* (C.A. 6, 1967), 373 F.2d 120, 121; *United States v. Pitts* (C.A. 5, 1970), 428 F.2d 534, 535, certiorari denied, 400 U.S. 910. *See also*, 8A Moore's Federal Practice, Paragraphs 29.01 et seq.

*Dayton v. Rogers*, 60 Ohio St.2d, 162, 163, 398 N.E.2d 781 (1979).

{¶75} In light of the above, because this was a bench trial, counsel was not ineffective for not making a Crim.R. 29 motion for acquittal. Further, for the reasons already discussed, the city presented sufficient evidence to support the menacing conviction.

> 5. Failure to File a Pretrial Motion to Dismiss and/or Motion for Acquittal based on First Amendment Violations and the Void for Vagueness Doctrine

{¶76} Fonte also contends that counsel was ineffective for not filing a motion to dismiss based on alleged constitutional violations. These violations are also the subject of Fonte's fifth and sixth assignments of error and will be addressed herein.

{¶77} The city contends that Fonte's counsel did file a motion to dismiss on his behalf and, when the motion was denied, a motion for reconsideration. That contention is not true; both motions were filed by Fonte, pro se, based on speedy trial grounds. Nonetheless, for the reasons discussed below, filing such a motion on the grounds advanced by Fonte would have been an exercise in futility.

{¶78} Fonte contends in his fifth assignment of error that his conviction violated his right to freedom of speech and right to petition the government for redress of grievances. In his sixth assignment of error, Fonte contends that the menacing statute was unconstitutionally indefinite and vague.

**{¶79}** Initially we note that there is a strong presumption in favor of the constitutionality of statutes. *State v. Anderson*, 57 Ohio St.3d 168, 171, 566 N.E.2d 1224 (1991). The party challenging a statute must prove that it is unconstitutional beyond a reasonable doubt. *Id.* Having said that, we dismiss Fonte's constitutional challenges, and rely on the Eleventh Appellate District's resolution of such a challenge as stated below:

> To find a statute unconstitutional as applied, it must be determined whether appellant had a constitutionally protected right to engage in the type of activity he allegedly committed. *State v. Bilder* (1994), 99 Ohio App.3d 653, 663-664, 651 N.E.2d 502. If appellant did not have a constitutionally protected right to engage in those activities, then his argument that the statute is unconstitutionally overbroad must fail. *Id.* at 664.

> This court stated in *State v. Jones*, 11th Dist. No. 2002-T-0084, 2003-Ohio-2920, at P14, that '* * * the overbreath doctrine has no application to criminal statutes outside the First Amendment.' '* * * The fighting words exception to the First Amendment falls within the disorderly conduct arena and has no relevancy in [a] * * * menacing situation.' *Dayton v. Dunnigan* (1995), 103 Ohio App.3d 67, 71, 658 N.E.2d 806. 'The crime of * * * menacing is triggered by a threat which intimidates or causes fear or apprehension by the recipient.' *Id.*, citing *State v. Schwartz* (1991), 77 Ohio App.3d 484, 486, 602 N.E.2d 671. 'Such threats are not among the class of utterances which are protected by the First Amendment.' *Dunnigan* at 71.

> In the case at bar, the record reflects that appellant preserved for review a First Amendment objection to R.C. 2903.22. Appellant argues that R.C. 2903.22(A) is unconstitutionally overbroad and punished his right to free speech. Appellant stresses that the ultimate question in the instant matter is whether it was established that his speech fell within one of the unprotected categories, particularly the 'fighting words' exception. As authority, however, appellant cites to disorderly conduct cases, which have no bearing on the present 'threat' case.

> Pursuant to *Dunnigan*, supra, the fighting words exception to the First Amendment falls within the purview of disorderly conduct and has no

relevancy to a menacing case. R.C. 2903.22(A) is a criminal statute aimed at prohibiting harmful conduct rather than the expression of ideas or beliefs. Appellant did not have a constitutionally protected right to knowingly cause two victims to believe that his suspicious package would cause physical harm. Therefore, based on *Bilder*, *supra*, R.C. 2903.22(A) is not overbroad since the First Amendment does not protect the type of activity that appellant committed. Thus, appellant's fourth assignment of error is without merit.

*State v. Friesenhengst*, 11th Dist. Portage No. 2002-P-0094, 2003-Ohio-5217, ¶ 37-40.

**{¶80}** In light of the above, Fonte's claims of constitutional violations are without merit; his contention that his counsel was ineffective for not filing a motion to dismiss on constitutional violation grounds is also necessarily without merit.

Cumulative Error

**{¶81}** Finally, Fonte contends that the cumulative errors denied him of a fair trial. The courts recognize that a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial. *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. In order to find cumulative error, we must find: (1) that multiple errors were committed at trial, and (2) there is a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors. *State v. Viceroy*, 8th Dist. Cuyahoga No. 97031, 2012-Ohio-2494, ¶ 21, citing *State v. Clark*, 8th Dist. Cuyahoga No. 89371, 2008-Ohio-1404, ¶ 62.

**{¶82}** Having found no errors with respect to Fonte's claim of ineffective assistance of counsel, the doctrine of cumulative errors is inapplicable. Further, as previously discussed, we find that Fonte was not prejudiced by trial counsel's actions.

**{¶83}** In light of the above, the fourth, fifth, and sixth assignments of error are overruled.

**{¶84}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Parma Municipal Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
EILEEN A. GALLAGHER, J., CONCUR