[Cite as *State v. Wilson*, 2023-Ohio-1042.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                        No. 111755

v. :

MARCELL L. WILSON, :

    Defendant-Appellant. :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART,
          AND REMANDED
**RELEASED AND JOURNALIZED:** March 30, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-658850-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Lisa J. Turoso, Assistant Prosecuting Attorney, *for appellee.*

The Law Office of Jaye M. Schlachet and Eric M. Levy, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant Marcell L. Wilson appeals from his convictions and sentences for multiple counts of felonious assault, improperly discharging a firearm at or into habitation, discharge of a firearm on or near prohibited premises,

and aggravated menacing. These offenses stemmed from an incident where Wilson, after threatening to kill his girlfriend and police officers responding to the domestic incident, drove to the house where she was staying and fired six gunshots from his vehicle toward the police officers who were standing outside the house.

{¶ 2} On appeal, Wilson raises a myriad of issues concerning his convictions and sentence. He claims the evidence was insufficient for his convictions and the convictions were against the manifest weight of the evidence. He also challenges the imposition of the five-year drive-by shooting firearm specifications and the seven-year peace-officer firearm specifications accompanying the majority of his offenses. He raises additional issues regarding the indefinite sentences imposed under the Reagan Tokes Law. After a careful review of the record and applicable law, we affirm his convictions but vacate the five-year drive-by shooting specification accompanying the offense of discharge of a firearm on or near prohibited premises. We also remand the case for resentencing for the sole purpose of providing Wilson with the notification regarding his indefinite sentence required by the statute.

**Grand Jury Indictment**

{¶ 3} The grand jury returned a 16-count indictment against Wilson. Counts 1 to 10 related to an arson incident in his girlfriend J.R.'s apartment building on the day before the shooting incident. Wilson was acquitted of these charges, and

this appeal concerns only Counts 11 to 16, which related to the March 7, 2021 shooting incident.

{¶ 4} Counts 11, 12, and 13 charged Wilson with felonious assault, a first-degree felony, against Officers Matthew Heitzer, Cory Barfield, and Sarah Theobald, respectively. Each count was accompanied with one- and three-year firearm specifications, a five-year drive-by shooting specification, and a seven-year peace-officer specification.

{¶ 5} Count 14 charged Wilson with improperly discharging a firearm at or into a habitation, a second-degree felony; Count 15 charged him with discharge of a firearm on or near prohibited premises, a third-degree felony. Both counts were accompanied with one- and three-year firearm specifications and a five-year drive-by shooting specification. Count 16 charged him with aggravated menacing, a first-degree misdemeanor.

**Trial Testimony**

{¶ 6} The case was tried in a bench trial. For Wilson's offenses relating to the shooting incident, the state presented the testimony of J.R. and her mother, as well as three officers from the Maple Heights Police Department who responded to the 911 call and were present when Wilson drove by and fired six shots from his

vehicle. A detective and a fourth officer, who arrived after the shooting, also testified regarding their investigation of the shooting.

**A. Testimony of J.R. and her Mother**

{¶ 7} J.R., age 23, testified that she met Wilson when she was 17 and they have a two-year old daughter, who was being cared for by J.R.'s mother at her mother's house on Watercrest Avenue in Maple Heights. J.R. was staying with her sister at her sister's apartment in Warrensville at the time. On March 5, 2021, J.R. told Wilson she was breaking up with him and they argued over the phone all day. The next day, she stopped answering his phone calls and text messages at one point. Wilson then showed up at her apartment building and rang the buzzer to her door. She did not let him in. Feeling unsafe, she told her mother about Wilson's presence and her mother called the police. The police responded to the call but Wilson had left.

{¶ 8} J.R.'s sister was out of town at the time, and J.R. did not want to stay in her sister's apartment by herself. She went to her mother's house to stay for the night. The next day, Wilson continued to call her. On one of the phone calls, Wilson heard the voice of their daughter in the background. Because Wilson knew their daughter was being cared for by J.R.'s mother, J.R. quickly hung up the phone, for fear that Wilson may be alerted to her location. Soon after, Wilson began sending threatening text messages:

> Wilson: We all dying today. I am sending the police to your mom's house

J.R.:     Bruh

          What

          What is wrong with you?

Wilson:   Me and you [a]bout to be in a box * * *

          And I will be killin cops today that ain't stopping me get ready

          Or answer the phone

          How you wanna to it

          I was talking calm

          Bet I'm on my way! Old Cel in full go mode let's turn up * * *

          I am not f***in playing

          Tell somebody to come get my daughter

          Cause this ain't [a]bout to turn out good

          Don't worry. I can show you better than I can tell you

          Bet I'll just pull up to [your mother's] house again

          Once again you brought drama to your mother's house

          When should I be expecting the police cause if they pull up to this bitch they gone die and me [too]

          On my way!

Wilson followed these text messages with a screenshot of a map showing his location, and then sent several more messages:

          Y'all relationships don't work because you think it's okay to ignore someone when you mad instead of being an adult and communicating

Your done you called the police again bitch you aint' coming back from this I'm putting you in a box bitch

I hate you you will have a close casket

You one police ass bitch

You gone done a rat

**{¶ 9}** J.R. testified that her mother called the police again. When the police officers arrived, J.R. showed them the messages from Wilson.  Later, while inside the house, J.R. heard gunshots erupting and the bullets sounded "really close to the house."  She immediately took her daughter to the basement.

**{¶ 10}** J.R.'s mother testified that the day before the shooting incident, she called the police because her daughter was scared that Wilson was trying to get inside her apartment.  The police responded but Wilson was no longer in the area.  For her safety, J.R.  came over to her house to stay overnight.  The next day, while J.R. was on the phone with Wilson, he heard the voice of their daughter and found out J.R. was at her mother's house.  He began to send threatening messages, and J.R.'s mother called the police for help.

**{¶ 11}** J.R.'s mother testified that she did not believe the threats made in the text messages were real until Wilson started to send her daughter phone images of the landmarks near him, which showed that he was getting closer and closer to her house.  While the police were outside her house, she heard multiple gunshots loud

enough that she and her daughter ran down to the basement. The gunshots appeared to have come from a parking lot near the front of her house.

**B. Testimony of the Police Officers**

{¶ 12} Officers Sarah Theobald, Matthew Heitzer, and Cory Barfield of the Maple Heights Police Department responded to the call from J.R.'s mother on March 7, 2021. They parked a police vehicle in the driveway of her house and set up a perimeter around the house. Wilson's blue Chevy Trax drove by a nearby parking lot and four shots were fired from the vehicle. Moments later, as the vehicle sped off, two more shots were fired. The police recovered six shell casings from the area, and a bullet hole was located high up on a light post near the edge of the parking lot. The three police officers provided the following testimony regarding the incident.

{¶ 13} Officer Theobald testified that she was the first officer to arrive at the scene. J.R. and her mother were scared, frantic, and panicking. They told her that Wilson was on his way to the house and that he was driving a blue Chevy Trax. J.R.'s phone showed that Wilson had called her 49 times that day. In addition to the threatening text messages, they also showed her voicemails sent by Wilson and, in one of them, she could hear the sound of a firearm followed by Wilson saying that J.R. was "putting everyone's life in danger." She related Wilson's threats to Officer Heitzer, who was the second officer to arrive at the scene.

{¶ 14} Officer Barfield also arrived, and the officers set up a perimeter around the house. When Officer Heitzer spotted a blue Chevy Trax driving by, Officer Theobald took cover, and soon after, she heard multiple gunshots, followed

by two more after a pause. The last two shots sounded further away than the first round of shots. The officers called the Bedford Police Department and Garfield Heights Police Department for assistance. Subsequently, Officer Theobald located two witnesses, who saw the blue vehicle heading south and driving into the parking lot at a high rate of speed. The vehicle stopped at the edge of the parking lot abutting Watercrest Avenue, spun around, and drove away northbound through the parking lot. Officer Theobald acknowledged that there were no bullets whizzing by the officers; no one was injured; and the only bullet hole located was on a light post, which was struck at a spot about 12 feet off the ground.

{¶ 15} Officer Heitzer testified that he responded to a report of domestic violence in progress. The suspect was threatening to kill J.R. and any police officers attempting to stop him. He also learned that the suspect was on his way there and he had a weapon. He and Officer Theobald took the threat very seriously. While Officer Theobald was inside talking to J.R. and her mother, he stayed outside to provide security. Officer Theobald related to him that the suspect was texting, calling, and sending voice clips over the phone to J.R., repeating the threats that he was going to kill her and the police officers. He requested additional officers, and Officer Cory Barfield arrived to assist them.

{¶ 16} While the three officers were waiting at the front of the house, Officer Heitzer saw a blue Chevy Trax pull up near the parking lot. He took cover behind a tree. Officer Heitzer testified that the vehicle stopped briefly and then started rolling and he heard three gunshots fired toward the officers. He then moved from behind

the tree and toward the vehicle, using a house nearby as cover. Officer Barfield ran by him, and then two more shots were fired from the vehicle as it drove away, traveling north-northeast through the parking lot in the direction of a KFC restaurant drive-through. Officer Heitzer did not return fire because he did not want to put the public near the drive-through at risk. The officer's testimony was accompanied by a video from his body camera.

{¶ 17} On cross-examination, Officer Heitzer acknowledged that the light post struck by the bullet was very close to Wilson's vehicle and relatively distant from the officers' location and that his belief that the shots were fired at the officers was more a result of the threatening text messages than his direct observations. When the defense counsel suggested that Wilson may be firing up in the air instead of at the officers based on the location of the bullet hole on the post, Officer Heitzer testified that because Wilson fired the shots while he was driving, "[a]nything could have happened causing a dramatic change in the trajectory of that bullet."

{¶ 18} Officer Cory Barfield, the third officer at the shooting scene, testified that he saw the blue Chevy pull up and he heard four or five gunshots. He sought cover behind the house and then saw the vehicle drive off at a high rate of speed through the parking lot.

{¶ 19} Detective Thomas Halley, a 20-year veteran police officer, arrived after the shooting incident. He testified that a total of six shell casings were found in the parking lot area. Four of them were located near a light post on the edge of the parking lot. Two were located further north in the parking lot, somewhat close to a

KFC restaurant near the other end of the parking lot. One bullet hit the light pole high off the ground. While Detective Halley testified, the state played a video from the security camera on J.R.'s mother's house. It captured the moment when the blue vehicle came into view in the nearby parking lot and gunshots were heard. Detective Halley also testified that Wilson's phone showed that he Google-searched the Maple Heights Police Department on March 7, 2021.

{¶ 20} On cross-examination, Detective Halley testified that the parking lot was about 50 yards from the house and, due to its location on the edge of the parking lot, the light post was the same distance from the house. Based on the locations of the four shell casings, Detective Halley acknowledged that the shooter would have been between 20 and 30 feet from the light post when the first round of shots was fired. He was asked whether, based on the bullet hole's location on the light post, the shooter must have angled the gun upwards. Officer Halley replied that he had seen "bullets do a lot of strange things" and factors such as wind, the shooter's training and emotional state at the time, and whether the shooter was stationary or in a moving vehicle, would all affect the trajectory of a bullet. Detective Halley also testified the police were unable to recover the other five bullets because bullets "travel far."

{¶ 21} In addition, Officer Aaron Carmine testified that he also assisted with the investigation and he was the officer who found the group of four casings. The casings were found in a small area, indicating they were fired in rapid succession.

Detective Christopher Faunce testified that on March 9, 2021, the U.S. Marshals located Wilson in Euclid and he assisted with Wilson's apprehension.

{¶ 22} The defense presented the testimony of Domonique Hill, Wilson's cousin, who testified that Wilson was arrested at her residence. She testified that she was in communication with J.R. in the evening of March 6, 2021, and she never mentioned a fire in her apartment building. She also testified that she was the owner of the blue Chevy Trax and J.R. would drive the vehicle. Wilson was driving the vehicle on the weekend of March 6, 2021, because J.R. was driving another vehicle. On March 7, 2021, Wilson returned the vehicle to her.

{¶ 23} The trial court acquitted Wilson of all counts relating to the arson incident but found him guilty of all counts relating to the shooting. It imposed a seven-year term for each of the peace-officer specifications in Count 11 (felonious assault relating to Officer Heitzer) and Count 12 (felonious assault relating to Officer Barfield), and required the seven-year terms to be served consecutively. The consecutive seven-year terms were ordered to run concurrently to the remining firearm specifications: seven-year peace officer specification in Count 13 (felonious assault relating to Officer Theobald) and five-year drive-by shooting firearm specifications in Count 14 (improperly discharging at or into habitation) and Count 15 (discharge of a firearm on or near prohibited premises). The total term for

the firearm specifications in Counts 11-15 are 14 years, to run prior to and consecutive to the terms for the underlying offenses.

{¶ 24} For the underlying offenses, the trial court imposed an indefinite sentence of three to four-and-a-half years each for Counts 11, 12, 13, and 14, and 36 months for Count 15, to run concurrently to each other.  For Count 16 (aggravated menacing), the court sentenced Wilson to time served.

**Appeal**

{¶ 25} On appeal, Wilson raises the following assignments of error:

I.  Appellant's convictions must be reversed where the State of Ohio failed to present sufficient evidence to support the convictions.

II. Appellant's convictions are against the manifest weight of the evidence.

III. The trial court erred by imposing the five-year drive-by shooting firearm specifications upon appellant for a conviction of discharge of firearm on or near prohibited premises, a strict liability offense.

IV. The trial court erred when it failed to determine at sentencing whether the offenses were committed by the same conduct and imposed several firearm specifications not authorized by law.

V. Appellant's indefinite sentence imposed under the Reagan Tokes sentencing scheme violates his rights under the United States Constitution and appellant's sentence is contrary to law where the trial court failed to comply with the required notices contained in R.C. 2929.19(B)(2)(c) when imposing sentence.

VI. The trial court erred and imposed a sentence contrary to law when it imposed a maximum sentencing term on all counts sentenced under Reagan Tokes.

**Sufficiency of Evidence**

{¶ 26} Under the first assignment of error, Wilson claims there was insufficient evidence to prove that he was the shooter and further claims that, even if sufficient evidence established that he was the shooter, the state failed to present sufficient evidence to prove any of the six counts he was convicted of.

{¶ 27} When reviewing a challenge to the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

**A. Identity of the Shooter**

{¶ 28} Wilson claims that there were no eyewitnesses identifying him as the shooter and therefore there was insufficient evidence to convict him of any of the offenses he was charged with. Our review, however, reflects that the state produced

an overwhelming amount of circumstantial evidence proving he fired several gunshots from the blue Chevy Trax.

{¶ 29} Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. "[C]ircumstantial evidence requires the drawing of inferences that are reasonably permitted by the evidence." *Id*. Circumstantial evidence and direct evidence inherently possess the same probative value. *Jenks* at paragraph one of the syllabus. "'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.'" *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶ 30} Here, the evidence shows that after Wilson threatened to kill J.R. and the police officers responding to the domestic incident, he sent his locations to J.R. indicating he was driving toward J.R.'s mother's house. The blue Chevy Trax, which J.R. knew Wilson was driving at the time, was soon sighted by the police officers around a parking lot near the house and, moments later, gunshots emitted from the

vehicle. The circumstantial evidence establishing Wilson to be the individual firing the gunshots from the vehicle was overwhelming.

## B. Felonious Assault (Counts 11, 12, and 13)

{¶ 31} Wilson was convicted of three counts of felonious assault as defined in R.C. 2903.11(A)(2), which states that no person shall knowingly "cause or attempt to cause physical harm to another *** by means of a deadly weapon or dangerous ordnance." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "The mental element of knowledge does not require an inquiry into the purpose for an act, but, involves the question of whether an individual is aware that his or her conduct will probably cause a certain result or will probably be of a certain nature." *In re F.D.*, 8th Dist. Cuyahoga No. 102135, 2015-Ohio-2405, ¶ 16, citing *State v. Anderson*, 10th Dist. Franklin No. 06AP-174, 2006-Ohio-6152, ¶ 43.

{¶ 32} Wilson argues there was insufficient evidence to prove that he knowingly attempted to cause physical harm to the officers because the evidence shows that he fired the shots at a trajectory high up in the air and the officers were not in the line of fire.

{¶ 33} "[A]n attempt to cause physical harm may be inferred from the act of firing a gun in the direction of a person." *State v. Knowles*, 10th Dist. Franklin No. 16AP-345, 2016-Ohio-8540, ¶ 28. "Firing a weapon randomly in the direction

of individuals who are arguably within the range of the shooter is sufficient to demonstrate an attempt to cause physical harm." *State v. Tinsley*, 8th Dist. Cuyahoga Nos. 92335 and 92339, 2010-Ohio-2083, ¶ 23.

{¶ 34} Wilson argues that there was no testimony from the officers that they saw a gun pointing at them or saw bullets whizzing past them, and the evidence showed that no bullets were located near the officers. However, our review of the testimony indicates that Officer Heitzer testified the shots were fired toward them, and the officers took cover after the first round of shots were fired. In addition, the state produced evidence that Wilson had repeatedly threatened to kill the police officers involved in the domestic dispute in the morning of the shooting incident. Our review for a claim regarding sufficiency of the evidence requires us to examine the evidence in a light most favorable to the state. *State v. Goff*, 82 Ohio St.3d 123, 128, 694 N.E.2d 916 (1998). Upon a thorough review of the record, we conclude the state produced sufficient evidence for the trier of fact to consider the issue of whether Wilson knowingly attempted to cause physical harm to the officers by firing the gunshots from his vehicle.

{¶ 35} Wilson also claims that there was insufficient evidence for the seven-year peace officer specification accompanying the felonious assault offenses. R.C. 2941.1412 provides that a mandatory seven-year term is imposed if the count a defendant is convicted of "specifies that the offender discharged a firearm at a peace

officer or a corrections officer while committing the offense." For the same reasons provided in the foregoing, this claim lacks merit.

## C. Improperly Discharging a Firearm at or Into Habitation (Count 14)

{¶ 36} R.C. 2923.161(A)(1) prohibits a person from knowingly "[d]ischarg[ing] a firearm *at or into* an occupied structure that is a permanent or temporary habitation of any individual[.]" (Emphasis added.) Wilson argues that the statute does not include an attempt to commit the offense and, therefore, because no bullet struck the subject house, there was insufficient evidence to prove the offense.

{¶ 37} We disagree with Wilson's interpretation of the statute. On the face of the statute, there is no requirement of harm to the habitation for a conviction under the statute. "Courts generally presume a legislature not to have put redundant words or phrases into a statute." *Gabbard v. Madison Local School Dist. Bd. of Edn.*, 165 Ohio St.3d 390, 2021-Ohio-2067, 179 N.E.3d 1169, ¶ 103. The statute here specifically employs two different prepositions: while the preposition "into" would imply an impact of a bullet with the habitation, the preposition "at" would appear to simply require the discharge of a firearm toward the habitation.

{¶ 38} As we have determined in the foregoing, the state presented sufficient evidence to support its allegation that Wilson, after threatening to kill J.R. and responding police officers, fired multiple gunshots toward the officers who were standing in front of the subject house. As such, we find sufficient evidence existed for the offense of improperly discharging a firearm at or into habitation as defined

in R.C. 2923.161(A)(1). *See e.g., State v. Romeo,* 7th Dist. Mahoning No. 14 MA 0060, 2016-Ohio-5657, ¶ 10 (the evidence of gunshots emanating from the defendant's vehicle coupled with threatening text messages to the victim constituted sufficient evidence for the conduct prohibited by R.C. 2923.161(A)).[1]

## D. Discharge of a Firearm on or Near Prohibited Premises (Count 15)

{¶ 39} R.C. 2923.162 sets forth the offense of discharge of a firearm on or near prohibited premises. R.C. 2923.162(A)(3) prohibits a person from "[d]ischarg[ing] a firearm upon or over a public road or highway." The offense is a strict liability offense. *State v. James,* 2015-Ohio-4987, 53 N.E.3d 770, ¶ 33 (8th Dist.).

{¶ 40} Pursuant to R.C. 2923.162(C)(1), the offense is a misdemeanor of the first degree. However, the offense is a felony of the third degree if the violation "created a substantial risk of physical harm to any person or caused serious physical harm to property." R.C. 2923.162(C)(2). The state charged Wilson with a third-degree felony offense in violation of R.C. 2923.162(A)(3) for creating a substantial risk of physical harm or causing serious physical harm to property.

{¶ 41} Wilson argues that there was no specific testimony from the officers that any bullets went over a public road. He also argues that the offense should be

---

[1] Wilson cites *State v. Jones,* 7th Dist. Mahoning No. 12 MA 181, 2013-Ohio-5915; *State v. Hillen,* 5th Dist. Fairfield No. 04 CA 65, 2005-Ohio-6193; *State v. Grayson,* 2017-Ohio-7175, 95 N.E.3d 1025 (8th Dist.), but none of these cases support his claim that a conviction of the offense requires proof that the habitation is struck by a bullet.

charged as a first-degree misdemeanor instead of a felony of the third degree because there was no testimony that anyone was nearby when the shots were fired.

{¶ 42} The exhibits presented at trial included videos from the officers' body cameras and several maps and pictures that showed that Watercrest Avenue abuts both the parking lot and the subject house and, due to the relative position of the parking lot and the house, shots fired toward the direction of the officers and the house would necessarily be fired "upon or over" Watercrest Avenue, a public road. Even if Wilson were to have intended to fire the shots at a certain trajectory to avoid hitting anyone, as he claims, the offense is a strict liability offense. Moreover, the offense can be completed "with no one remotely near the location where the firearm is discharged upon or over the public road or highway." *James*, 2015-Ohio-4987, 53 N.E.3d 770, at ¶ 33.

{¶ 43} Furthermore, the evidence shows that Wilson fired a rapid round of shots while driving his vehicle, followed by two more shots that he fired while the vehicle spun around and accelerated to leave the parking lot. The evidence presented by the state is sufficient to support its claim that Wilson's conduct created a substantial risk of physical harm to the public and its charge of a third-degree felony for Wilson's offense of discharging a firearm upon or over a public road or highway.

### E. Aggravated Menacing

{¶ 44} R.C. 2903.21 defines the offense of aggravated menacing. It states that "[n]o person shall knowingly cause another to believe that the offender will

cause serious physical harm to the person or property of the other person * * *."
R.C. 2903.21(A). Wilson claims there was insufficient evidence to convict him of aggravated menacing because, while he made certain threats to J.R., he never pointed the firearm at J.R. or the house and the shots did not land anywhere near the house.

{¶ 45} Wilson's claim is belied by the evidence, which shows that Wilson threatened J.R. with death and then sent her his locations as he drove toward J.R.'s mother's house. She then heard shots from inside the house. The state's evidence is more than sufficient to satisfy the elements of aggravated menacing.

{¶ 46} Having reviewed the record and applicable law, we conclude Wilson's sufficiency claim lacks merit and overrule the first assignment of error.

**Manifest Weight**

{¶ 47} Under the second assignment of error, Wilson argues his convictions were against the manifest weight of the evidence. While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins,* 78 Ohio St.3d at 390, 678 N.E.2d 541. Unlike a claim that the evidence is insufficient to support a conviction, which raises a question of law, manifest-weight challenges raise factual issues. "Under the manifest weight-of-the-evidence standard, a reviewing court asks the following question: whose evidence is more persuasive — the state's or the defendant's?" *State v. Williams*, 8th Dist.

Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86. When a defendant argues his or her conviction is against the manifest weight of the evidence, the court,

> reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 48} Wilson places great weight on the fact that one of the six bullets struck the light post high up on the post, which he argues reflects that he fired all the shots up in the air, an indication that he did not knowingly attempt to cause physical harm. The evidence regarding the location of the bullet hole on the light post is not as significant as Wilson claims. The location might reflect a lack of intent to cause physical harm, but it may also be a result of other factors affecting the trajectory of a bullet, as Officer Heitzer and Detective Halley testified; in addition, Wilson fired five other shots and their trajectory was unknown. There is substantial circumstantial evidence that he intended to cause harm to the officers responding to the domestic incident. Most damning are his own words expressed through the text messages shortly before the shooting. In addition, Officers Heitzer and Barfield testified that after the first round of shots were fired, they quickly took cover to protect themselves, which reflects their belief that they were being shot at. Wilson's manifest-weight claims regarding the remaining counts are similarly meritless.

Having reviewed the record and having weighed the evidence and all reasonable inferences, we do not find that the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." The evidence produced by the state did not weigh heavily against Wilson's convictions requiring a new trial. The second assignment of error is without merit.

**Validity of Drive-by Shooting Specification for Underlying Offense of Discharge of a Firearm on or Near Prohibited Premises**

{¶ 49} Under the third assignment of error, Wilson argues the trial court erred in imposing a five-year drive-by shooting specification on the underlying offense of discharge of a firearm on or near prohibited premises (Count 15) in contravention of R.C. 2941.146(A). The state concedes the error. As this court held in *State v. Maldonado*, 8th Dist. Cuyahoga No. 108907, 2021-Ohio-1724, the drive-by shooting specification is not applicable to the offense of discharge of a firearm on or near prohibited premises. This is because the specification adds a mandatory five-year prison term for offenders who commit "a felony that includes, as an essential element, purposely or knowingly causing or attempting to cause the death of or physical harm to another * * *," R.C. 2941.146(A), yet discharge of a firearm on or near prohibited premises is a strict liability offense lacking the mens rea of "purposely or knowingly." *James*, 2015-Ohio-4987, 53 N.E.3d 770, at ¶ 33. Accordingly, we sustain the third assignment of error and vacate the five-year drive-by shooting firearm specification for Count 15. Upon remand, the trial court is to

issue a sentencing entry reflecting the deletion of the five-year firearm specification. *See State v. Maldonado*, 8th Dist. Cuyahoga No. 110655, 2023-Ohio-522 (en banc).

**Firearm Specifications**

{¶ 50} The fourth assignment of error concerns the five-year drive-by shooting firearm specifications for Count 14 (improperly discharging firearm at or into habitation) and Count 15 (discharge of a firearm on or near prohibited premises), and the seven-year peace-officer specifications for Counts 11, 12, and 13 (felonious assault).

**A. Five-Year Drive-by Shooting Firearm Specification**

{¶ 51} First, Wilson claims that five-year firearm specifications for Counts 14 and 15 should have merged with the seven-year firearm specifications because the underlying offenses were based on the same act or transaction. As we have vacated the five-year drive-by shooting specification accompanying Count 15, the merger claim pertaining to Count 15 is moot and we only address the claim pertaining to Count 14.

{¶ 52} Firearm specifications may be subject to merger under R.C. 2929.14. *State v. Sheffey*, 8th Dist. Cuyahoga No. 98944, 2013-Ohio-2463, ¶ 26, citing R.C. 2929.14(B)(1)(c), Wilson argues the five-year drive-by shooting firearm specifications should have merged with the seven-year peace-officer specification.

A reading of the pertinent statutory sections governing the imposition of firearm specifications indicates that such a merger is not authorized by the legislature.

{¶ 53} R.C. 2929.14(B) governs the one- and three-year firearm specifications, five-year drive-by shooting firearm specification, and seven-year peace-officer specification. Division (B)(1)(a) governs the one- and three-year firearm specifications; division (B)(1)(c) governs the five-year firearm specification; and division (B)(1)(f) governs the seven-year firearm specification.

{¶ 54} Regarding the five-year firearm specification, R.C. 2929.14(B)(1)(c)(iii) provides that the court shall not impose more than one such term if the underlying felonies are committed as part of the same act or transaction.

{¶ 55} Wilson, however, is not arguing that his felony offenses underlying Counts 14 and 15 were committed as part of the same act or transaction and therefore the two five-year firearm specifications for Counts 14 and 15 should have merged with each other. Rather, he argues that because his offenses underlying Counts 14 and 15 were part of the same act or transaction as the offenses underlying Counts 11 to 13, the two five-year firearm specifications should have merged with the seven-year firearm specifications.

{¶ 56} Wilson's claim lacks merit because R.C. 2929.14(B)(1)(c)(iii) only governs the merger of multiple five-year firearm specifications. R.C. 2929.14(B), which governs the enhancement of a sentence with various firearm specifications, does not provide for a merger of five-year and seven-year firearm specifications

based on the underlying offenses being the same act or transaction. We additionally note that Wilson did not claim at trial that these underling offenses were committed as part of the same act or transaction.

## B. Seven-Year Peace-Officer Specification

{¶ 57} Second, Wilson also challenges the three seven-year peace-officer specifications imposed for the three felonious assault counts (Counts 11, 12, and 13). The trial court imposed consecutive seven-year terms for Counts 11 and 12, concurrent to the seven-year term for Count 13. Wilson argues the trial court was only authorized to impose two seven-year terms for the specification pursuant to R.C. 2929.14(B)(1)(f)(iii).

{¶ 58} Wilson's argument lacks merit. Division (B)(1)(f) of R.C. 2929.14 governs the imposition of the seven-year peace-officer specification. Division (B)(1)(f)(iii) states, in pertinent part:

> If an offender is convicted of or pleads guilty to two or more felonies that include, as an essential element, causing or attempting to cause the death or physical harm to another and also is convicted of or pleads guilty to a specification of the type described under division (B)(1)(f) of this section in connection with two or more of the felonies of which the offender is convicted or to which the offender pleads guilty, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(f) of this section *for each of two of the specifications* of which the offender is convicted or to which the offender pleads guilty *and, in its discretion, also may impose on the*

*offender the prison term specified under that division for any or all of the remaining specifications.  * * **

(Emphasis added.)

{¶ 59} By its plain language, the trial court, "shall" impose on the offender the seven-year term "for each of two of the specifications" and, *in its discretion*, may impose the seven-year term "for any or all of the remaining specifications."[2]  The trial court here acted within its discretion to impose a third seven-year term (and ordered it to run concurrently).[3]  The fourth assignment of error is without merit.

**Reagan Tokes Law**

{¶ 60} Under the fifth assignment of error, Wilson argues his indefinite sentences imposed under the Reagan Tokes Law is invalid because the law violates his constitutional rights.  This court has determined the statute to be constitutional

---

[2] The Supreme Court of Ohio recently released a decision, *State v. Bollar*, Slip Opinion No. 2022-Ohio-4370, concerning the three-year firearm specification, which is governed by division (B)(1)(a).  Although *Bollar* is not directly applicable to this case, we note that the court held that the trial court was authorized to impose multiple three-year firearm specifications even when the underlying offenses had been merged because they were committed as part of the same act or transaction.  The court reached the conclusion based on its interpretation of R.C. 2929.14(B)(1)(g), which governs the imposition of multiple one- and three-year firearm specifications and employs similar language permitting the trial court to, "in its discretion," impose additional prison term "for any or all of the remaining specifications" as authorized by division (B)(1)(a).

[3] We note that there is a limitation to the discretion exercised by the trial court under this section.  The last sentence of division (B)(1)(f)(iii) provides that "[i]f a court imposes an additional prison term on an offender under division (B)(1)(f) of this section relative to an offense, the court shall not impose a prison term under division (B)(1)(a) or (c) of this section relative to the same offense."  The trial court here appropriately imposed only a seven-year term for peace-officer specification each for Counts 11 to 13 without also imposing a prison term for the one- and there-year firearm specification or the five-year firearm specification.

in an en banc decision, *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.), and therefore, we summarily overrule his constitutionality claim.

{¶ 61} Under the fifth assignment of error, Wilson also argues that the trial court failed to comply with the required notification set forth in R.C. 2929.19(B)(2)(c) when imposing the indefinite sentence. Here, the trial court gave the following advisement regarding the Reagan Tokes Law:

> The sentencing judge will impose a minimum term from within the currently established sentencing range and a maximum term of an additional 50 percent of the minimum term imposed. Release is presumed to occur at the expiration of the minimum term; however, the Department of Rehabilitation and Correction[] may under certain circumstances rebut that release presumption and impose additional prison time up to the maximum term.

{¶ 62} Pursuant to R.C. 2929.19(B)(2)(c), the trial court notified Wilson of the rebuttable presumption that he would be released upon expiration of the minimum prison term; that under certain circumstances the presumption is rebuttable by the Department of Rehabilitation and Correction ("DRC"); and that, if rebutted, Wilson may remain in prison up to the maximum term.

{¶ 63} In *State v. Laws*, 8th Dist. Cuyahoga No. 111591, 2023-Ohio-77, ¶ 22-24, the trial court provided a similar notification and this court held that the notification was insufficient under R.C. 2929.19(B)(2)(c) because the trial court's reference to "certain circumstances" did not identify the "specified determinations" the DRC may make to rebut the presumption or that the presumption may be rebutted more than once up to the maximum term. *Id.* at ¶ 22. This court held, however, that "such an error does not undermine the conviction and that the proper

remedy is remand for resentencing so that the offender may be given the proper advisements." *Id*. at ¶ 23, citing *State v. Bobo*, 2022-Ohio-3555, 198 N.E.3d 580, ¶ 33 (8th Dist.); *State v. Bradley*, 8th Dist. Cuyahoga No. 110882, 2022-Ohio-2954, ¶ 13; *State v. Gates*, 8th Dist. Cuyahoga No. 110616, 2022-Ohio-1666, ¶ 27; and *State v. Whitehead*, 8th Dist. Cuyahoga No. 109599, 2021-Ohio-847, ¶ 46. *See also State v. Guzman*, 8th Dist. Cuyahoga No. 111153, 2022-Ohio-2414.

{¶ 64} The fifth assignment of error is overruled in part and sustained in part. This case is remanded for resentencing for the for the sole purpose of providing Wilson with the notification required by R.C. 2929.19(B)(2)(c).

**Imposition of Maximum Term for Concurrent Counts**

{¶ 65} Under the sixth assignment of error, Wilson argues the trial court erred in imposing more than one maximum term for Counts 11 to 14.

{¶ 66} Pursuant to R.C. 2929.14(A)(1)(a), for felony offenses sentenced under the Reagan Tokes Law, the trial court is required to impose an indefinite sentence with a stated minimum term selected by the court and a calculated maximum term determined in accordance with R.C. 2929.144.

{¶ 67} R.C. 2929.144 provides the statutory formula for the calculation of the maximum term. When a single count is involved, R.C. 2929.144(B)(1) applies. When there are multiple counts, R.C. 2929.144(B)(2) and (3) govern the calculation of the maximum prison term. R.C. 2929.144(B)(2) applies when the terms are to

run consecutively, and R.C. 2929.144(B)(3) applies when the terms are to run concurrently.

{¶ 68} Here, the trial court sentenced Wilson on Counts 11 to 14 to indefinite terms under the Reagan Tokes Law. It imposed a stated minimum sentence of three years and a calculated maximum term of four-and-a-half years each on all four counts, to be served concurrently. Wilson argues that the court can only impose a single maximum term under R.C. 2929.144(B)(3). Division (B)(3) states, in pertinent part:

> If the offender is being sentenced for more than one felony, if one or more of the felonies is a qualifying felony of the first or second degree, and if the court orders that all of the prison terms imposed are to run concurrently, the maximum *term* shall be equal to the longest of the minimum terms * * * plus fifty per cent of the longest minimum term for the most serious qualifying felony being sentenced.

(Emphasis added.) By using the singular noun "term," the statute appears to require the trial court to impose only one maximum term for all the concurrent counts. However, while R.C. 2929.144 governs the *calculation* of the maximum term, R.C. 2929.14(A)(1)(a) governs the *imposition* of indefinite sentences. It states, in pertinent part:

> *For a felony* of the first degree committed on or after the effective date of this amendment, *the prison term shall be an indefinite prison term with a stated minimum term* selected by the court of three, four, five, six, seven, eight, nine, ten, or 11 years *and a maximum term* that is determined pursuant to section 2929.144 of the Revised Code ***.

(Emphasis added.)

{¶ 69} Pursuant to R.C. 2929.14(A)(1)(a), for a qualifying felony offense, the trial court is required to impose a stated minimum term and a maximum term determined by the mathematical formula set forth in R.C. 2929.144. The trial court here complied with the statutory requirements when imposing indefinite sentences on the four concurrent counts. The sixth assignment of error lacks merit.

{¶ 70} Judgment affirmed in part and vacated in part, and the matter is remanded to the trial court. Upon remand, the trial court is to resentence Wilson for the sole purpose of providing Wilson with the required statutory notification regarding his indefinite sentence and the sentencing entry is to reflect the deletion of the five-year firearm specification accompanying the offense of discharge of a firearm on or near prohibited premises.

It is ordered that appellant and appellee share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, JUDGE

ANITA LASTER MAYS, A.J., and
EILEEN T. GALLAGHER, J., CONCUR


N.B. Administrative Judge Anita Laster Mays is constrained to apply *Delvallie's* en banc decision. For a full explanation of her analysis, *see State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.) (Laster Mays, J., concurring in part and dissenting in part).

Judge Eileen T. Gallagher joined the dissent by Judge Lisa B. Forbes in *Delvallie* and would have found that R.C. 2967.271(C) and (D) of the Reagan Tokes Law are unconstitutional.