[Cite as *State v. Lewis*, 2025-Ohio-2454.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                   :

    Plaintiff-Appellee,                    :

                                  No.  114511

                                          :

    v.                                             :

DEANDRE LEWIS,                                   :

    Defendant-Appellant.                   :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART, REVERSED IN PART,
               AND REMANDED
**RELEASED AND JOURNALIZED:**  July 10, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No.  CR-23-686866-C

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Timothy Troup, Assistant Prosecuting Attorney, *for appellee.*

Law Office of Timothy Farrell Sweeney, and Timothy F. Sweeney, *for appellant.*

EMANUELLA D. GROVES, P.J.:

{¶ 1} Defendant-appellant, DeAndre Lewis ("Lewis"), appeals his conviction for multiple felonies, including murder. For the reasons that follow, we affirm in part, reverse in part, and remand for resentencing pursuant to this opinion.

## Factual and Procedural History

{¶ 2} On May 14, 2023, A.G. and B.M. were killed and D.S. was injured after a fatal encounter with Lewis, Ahmid Hinton ("Hinton"), and Reginald Brown Jr. ("Brown"). A grand jury was convened and an indictment was issued on November 28, 2023, alleging the following charges against all three men: two counts of aggravated murder (Counts 1 and 6); four counts of murder (Counts 2, 3, 7, and 8); one count of attempted murder (Count 11); six counts of felonious assault (Counts 4, 5, 9, 10, 12, and 13); and three counts of discharge of a firearm on or near prohibited premises (Counts 14, 15, and 16). Each count included one-, three-, and five-year firearm specifications. Hinton faced additional charges, including having weapons while under disability, obstructing justice, and tampering with evidence.

## Lewis' Dissatisfaction with Trial Counsel

{¶ 3} Prior to trial, it became apparent that Lewis was dissatisfied with his court-appointed lawyers. At a pretrial on April 16, 2024, one week prior to trial, Lewis' lawyers notified the court that all the discovery was marked "for counsel only." However, counsel had discussed the issue with the State and secured an agreement to redact confidential information so that Lewis could review the discovery himself. After discussing several trial matters, the court addressed Lewis

and asked if there was anything else he wished to discuss. At that point, Lewis told the court he wanted new counsel. Lewis informed the court that his lawyers were ineffective and he did not feel comfortable going to trial with them. Lewis' primary complaint was that his attorneys did not meet with him often enough and that he had not been able to review any discovery. Lewis represented that counsel had received 43 items of discovery and only seven were marked "counsel only," so he did not understand why he had not been allowed to review evidence open to him. The record reflects that the State designated most of the discovery "counsel only" but there were items open for Lewis' review. The trial court addressed Lewis directly and noted that the parties had come to an agreement that would allow him to review the discovery. In addition, the court discussed how trials work, what the court had seen counsel do thus far, and expressed understanding of Lewis' frustration as he had been in jail for the past several months. When asked, Lewis indicated he had no further concerns. Ultimately, the trial date was continued to July and later continued again to September 2024.

{¶ 4} On August 21, 2024, Lewis filed a pro se motion "to withdraw counsel" (the "motion to remove appointed counsel" to distinguish between Lewis' lawyers' later motion to withdraw). In it, he made the same allegations he did at the April pretrial. He alleged that his lawyers had not contacted him and were not communicating with him regarding his case. He again alleged that his lawyers had not shown him the discovery. He also expressed that he did not have confidence in

his attorneys proceeding to trial on his behalf.  The record does not reflect that this motion was addressed prior to trial.

{¶ 5} On September 18, 2024, the first day of trial, Lewis' attorneys informed the court that they had just learned that Lewis had filed a grievance against them with the Cleveland Metropolitan Bar Association ("CMBA").  The attorneys argued that this was a clear conflict of interest and asked for a one-day continuance to confirm the existence of the grievance.  The trial court denied the request, noting that, at that point, counsel did not have any evidence of or know the substance of the grievance.  Further, the court expressed concern that Lewis waited until the first day of trial to raise the issue.  The trial court noted it would hear additional evidence if counsel obtained proof of the grievance.  The case proceeded to jury selection and adjourned for the day.

{¶ 6} When the case reconvened the following day, the State raised Lewis' August 21, 2024 motion to remove counsel, noting that it had not been addressed. In response, the trial court noted that the issue had been addressed at the last hearing and overruled the motion.  In later discussions, the court noted that the motion was addressed on and off the record on August 26, 2024.  The defense agreed that they did discuss Lewis' pro se motion but did not indicate when that occurred. The docket does not reflect a pretrial or a hearing between August 21, 2024, and the first day of trial.  The trial court continued with jury selection.

{¶ 7} During a break, the defense informed the court that they had proof that a grievance had been filed and were in receipt of a letter addressed to Lewis from

CMBA dated August 27, 2024. As a result, counsel informed the court that they now had an adversarial relationship with their client and asked to withdraw from the case. The court pointed out that the grievance had been filed at least 24 days prior and, yet Lewis had not raised the issue with his counsel nor the court until the first day of trial. The court also noted that although there was proof a grievance had been filed, the substance of the grievance was unknown. Notably, one of Lewis' lawyers represented that the nature of the grievance was "private" until it was resolved. The court read a letter Lewis received from CMBA into the record, which noted that CMBA received the grievance, that the initial review would take 60-90 days, and that a formal investigation would take longer. The court informed the parties that it would consider any case law they presented on the effect of an attorney grievance on an ongoing trial, but in the interim the case would proceed. Lewis' attorneys noted that if they were required to continue representing Lewis, they would do so under duress. The trial court called the jury into the courtroom, and the parties continued jury selection.

{¶ 8} During another break, the State, citing *State v. Young*, 2022-Ohio-3132 (8th District), asked the trial court to address Lewis directly on the record to determine whether his issue(s) with his lawyers were sufficient to warrant removal of court-appointed counsel. The defense essentially agreed with the State's argument, though they found *Young* distinguishable because the crimes in Lewis' case were much more serious than in *Young*. Further, Lewis' lawyers informed the

court that Lewis had just told them he was unwilling to work with them. Without his input, they argued, they were not comfortable continuing to represent Lewis.

{¶ 9} In response, the court noted that there had been several pretrials establishing that counsel had diligently worked the case and this grievance was "an invention that is taking place at the point of trial to again delay the trial." Additionally, the court noted that there had been previous delays for similar reasons and that changing counsel at this point would not improve the situation. Ultimately, the trial court determined that, based on the information presented, the trial would continue but the issue would be left open for further review.

{¶ 10} At the conclusion of voir dire, the trial court addressed this issue again, framing it as consideration of Lewis' pro se motion, which the court had already denied. The trial court extensively reviewed the history of the case, including the evidence that Lewis had effectively communicated with his counsel thus far and the fact that Lewis had an opportunity to raise any new issues with the court but failed to do so even after filing a grievance. The trial court ultimately found that

> [Lewis'] grounds, or demand, to dismiss the attorneys, I judge to be frivolous from my experiences, and what I have seen here in this case.
> I see this . . . as a dodge to delay trial. I'm not going to delay this trial.

{¶ 11} Nevertheless, the trial court offered the parties an opportunity to email any relevant case law prior to the case reconvening in the morning. Barring receipt of persuasive arguments countering the court's position, the trial court would swear in the jury and proceed with trial. The defense restated its objections to proceeding

with trial and reiterated that, if the court required them to proceed, they would do so under duress.

{¶ 12} The following day, September 20, 2024, the trial court began by noting the parties had asked for an opportunity to talk and potentially negotiate a plea deal. After an off-the-recording discussion, the parties represented they were unable to reach an agreement. Prior to bringing in the jury, Lewis' attorneys raised their motion to withdraw as counsel and requested a mistrial due to the grievance Lewis filed. The court interrupted noting that a mistrial would be premature at that juncture because the jury had not been empaneled. The court noted that there was no evidence presented to support the motion. Further, the court addressed the fact that neither party had availed themselves of the opportunity to submit any case law. Finally, the court found,

> There's no case law in the State of Ohio or America that would support that position to grant a mistrial on a mere mailing to the Bar Association, whatever in the world the charge was.

{¶ 13} The trial court then swore in the jury, and the trial commenced.

**The Trial**

{¶ 14} The State presented numerous witnesses who offered testimony regarding their participation in the investigation of the case. However, there were only three eyewitnesses to the events: D.S., the only surviving victim of the shooting, and Hinton and Brown, who both testified pursuant to plea agreements with the State.

{¶ 15} D.S. testified that she; her aunt, B.M.; and her close friend, A.G., went to a bar until the early morning hours of May 14, 2023. They left when the bar closed and headed to D.S.'s home on East 76th Street in Cleveland. When they arrived, A.G. stayed in the car, while B.M. and D.S. went inside. D.S. testified that when she exited her home with B.M., she noticed a car parked near her car. She did not pay much attention to it because there was an after-hours club across the street that was still open. As she approached the car, however, she noticed the long barrel of a gun hanging out of the back window.

{¶ 16} D.S. testified that she tried to determine what was going on, but the driver of the car immediately began swearing at her. Per D.S., besides the driver, there were two other people in the car, one in the back seat and one in the front passenger seat. D.S. testified she did not know what prompted the driver to speak to her like that, but she thought maybe A.G. and the driver had had an argument while D.S. was in the house. D.S. further testified that the driver brandished a gun while he was yelling at her. D.S. gave up on trying to talk to the driver and got in her car. After that, D.S. did not see what happened, but she testified that she later saw a video of the incident. From the video, she learned that someone got out of the other car and started shooting at her car.

{¶ 17} D.S. testified that she remembered trying to start her car but, because she was not wearing her glasses and there was dim lighting, she could not see the ignition. As a result, she bent down to see more clearly. As she lowered her head, she heard a shot go through her driver's side window. She yelled at her companions

to duck. At first, she did not know who was shooting or where the shooting was coming from. D.S. testified that she realized that her car was being shot at when she heard bullets come through the metal. She estimated that she heard 15 shots. D.S. remained crouched down with her head in A.G.'s lap.

{¶ 18} Later, testimony from Cuyahoga County Deputy Medical Examiner David Dolinak M.D. ("Dr. Dolinak") established that A.G. was shot once in the head, a fatal wound. B.M. never made it into the car and was shot six or seven times, the fatal bullet traversing her heart and both lungs.[1] D.S. testified she was shot once in the buttocks and grazed by a bullet along her left arm.

{¶ 19} Hinton, Lewis' older brother, also testified. Hinton agreed to testify truthfully at Lewis' trial in exchange for a guilty plea to attempted felonious assault, having weapons while under disability, and obstructing justice. Hinton testified that he received a call on May 13, 2024, from Lewis' father, who was looking for Lewis. Hinton called Lewis and learned that he was at the gun range obtaining his concealed carry permit. Eventually, Hinton went to pick up Lewis in his pearl-white Buick Lucerne with a gold door. After meeting up, the two went to Lewis' girlfriend's home. While there, Hinton and Lewis got into an argument, after which Hinton left and went to Lewis' home on Kimberly Avenue. Hinton later heard a commotion and went outside, where he found Lewis and Brown, his cousin, talking to some other people from the neighborhood. Hinton testified that all three got into the car and

---

[1] Dr. Dolinak, testified that two of B.M.'s seven bullet wounds could have been caused by a single bullet.

drove to their grandmother's home on East 76th Street, because Brown's father was there and wanted to see him. During the drive, Hinton and Lewis had another disagreement. Lewis asked to get out of the car, and Hinton dropped him off on East 76th Street, about three houses from their destination. Per Hinton, when Lewis exited the car, he pulled out a gun and shot two or three bullets into the ground. Hinton and Brown proceeded to their grandmother's home.

{¶ 20} Hinton testified that he told Brown he should leave because he was on probation, presumably concerned because he was carrying a weapon in violation of probation and the gunshots Lewis fired would draw the police. Around that time, per Hinton, D.S. walked up to the car, realized it was the wrong vehicle, and apologized for approaching the wrong car. Hinton responded that it was okay and then tried to flirt with her. Hinton testified that D.S. turned and smiled at him but kept walking. At that point, Hinton testified that B.M. walked up to the car and put her key in his mouth. Hinton testified that she pushed the key far enough into his mouth that it touched the inside of his left cheek. Hinton was caught off-guard and felt very uncomfortable with her actions. In his words, he began "ranting and raving a little bit," in part because he did not know either woman. Hinton then saw a car coming down the street and, because his car was blocking the road, backed up to an open parking spot, a position that put him closer to where D.S. had parked her car.

{¶ 21} Hinton testified that D.S. seemed to be trying to diffuse the situation, by acting as a peacemaker, although he could not hear what she was saying. Hinton explained that her efforts worked, because B.M. continued to talk to him, asking him

where he was from, and telling him she had never seen him around before. Hinton testified that he responded in kind, explaining he had lived in the neighborhood his whole life. Nevertheless, Hinton testified that he exited the car when Lewis returned and he complained to Lewis that B.M. put a key in his mouth.

{¶ 22} According to Hinton, Lewis immediately began shooting in response to Hinton's words. Hinton testified that he asked Lewis what he was doing, but Lewis kept shooting. Hinton then raised his gun and pointed it at Lewis, but he did not shoot. Hinton denied firing any shots at the women. Afterwards, Hinton testified that his aunt came out of his grandmother's home and told him to leave. Hinton and Lewis got back into the car, and the three drove off. Hinton testified that the majority of the gun shots came from Lewis, but he knew that at least one shot came from the backseat of his car where Brown was sitting.

{¶ 23} Hinton testified that he later painted over the gold door of his car to avoid retaliation from people connected to the women and apprehension from the police. However, Hinton's car was towed from his mother's house several days later. Hinton explained that he contacted the police after realizing he was under investigation because he wanted to avoid blame for something he did not do. He gave a full statement to the police implicating Lewis as the shooter. Hinton testified that he gave this statement without any promise of a plea deal and that his statement remained the same after the State offered him a plea to reduced charges.

{¶ 24} Finally, 17-year-old Brown, who was tried as an adult, agreed to plead guilty to attempted murder, in exchange for a promise to testify truthfully at Lewis'

trial. Brown's testimony corroborated Hinton's, with a few exceptions. When Brown first saw Hinton, Hinton came outside and shot his gun into the air a couple of times. Brown testified that Lewis was drunk and had taken some pills that night. Brown also confirmed that when they arrived at East 76th Street, Lewis shot into the ground after he exited Hinton's car. When B.M. approached Hinton, Brown testified that he thought Hinton and B.M. knew each other and were flirting with one another. He saw B.M. put a key on Hinton's lip, rather than in his mouth. Brown confirmed that he heard Hinton tell Lewis that B.M. put a key in his mouth. He also saw Lewis and B.M. argue.

{¶ 25} Brown testified that he did not see who was shooting. He did not know what was happening and thought that some unknown person was shooting at them. The State showed Brown the video of the incident, and he identified Lewis as the person firing the gun. Brown admitted that he had a gun on him, a .45 caliber pistol, that he obtained from Hinton. He also admitted that he fired one shot out of the car window. He denied aiming at anyone or attempting to shoot anyone.

{¶ 26} Brown further testified that as they were leaving the scene, he heard Lewis on the phone with his girlfriend. Per Brown, Lewis told her that he had to shoot the "girls" because they were "playin' crazy." Brown testified that Hinton demanded to know why Lewis said that on the phone. Brown then saw Lewis throw his phone out of the window. When they got back to Lewis' home, Brown testified he overheard a conversation between Lewis and his mother. Lewis told his mother that the women were "talking crazy," they "got into it," and he started shooting.

{¶ 27} Brown explained that a few days after the shooting, Hinton and Lewis visited Brown at his home. Brown testified that Lewis told them that if any of them got "caught up," they would not mention Brown. According to Brown, Lewis said that if anyone talked, "you know who comin'."

{¶ 28} Brown admitted that when Cleveland homicide detectives initially talked to him, he lied and denied being present or knowing anything about the shooting. Brown testified that after securing a plea deal, he gave a subsequent statement detailing what actually happened and that his testimony comported with that second statement.

{¶ 29} Former Cleveland Police Forensic Video Analyst Tom Ciula, a forensic video analyst working with Cleveland police, was able to obtain a video of the incident from a camera across the street. In the video, D.S.'s car is in the foreground with A.G. sitting in the passenger seat. A white car, identified as Hinton's, is stopped across the street. A Black male with long hair, either in braids or locs, can be seen exiting the car and walking away. Both Brown and Hinton viewed the video from the witness stand and identified the Black male as Lewis. Shortly thereafter, Hinton's car drives forward and out of camera range. For about three minutes, nothing happens, except the light from A.G.'s cell phone flickering off and on.

{¶ 30} At approximately the three-minute mark, B.M. and D.S. are seen walking towards D.S.'s car. At the same time, Hinton's car backs up into a space across the street near D.S.'s car. B.M. and D.S. are standing at the driver's side door of D.S.'s car and appear to be talking to Hinton. D.S. then enters her car while B.M.

continues to talk to Hinton. From the left, Lewis can be seen in the vicinity of Hinton's car. A traffic sign obscures the view of his approach. Lewis appears to be talking to B.M. over the top of Hinton's car. Hinton exits the car and turns to speak to Lewis. B.M. moves from the driver's side of D.S.'s car and walks forward to cross in front of D.S.'s car. Lewis then pulls out a gun, points it at B.M., and fires multiple times. B.M. does not appear to realize what is happening at first, but she starts to move faster around D.S.'s car, begins to run, and drops to the ground into a fetal position once behind the vehicle. The shooter's arm follows B.M. as she moves, shooting at both B.M. and the car itself. Afterwards, both Lewis and Hinton reenter Hinton's car and begin to drive away. As they drive away, a flash can be seen coming from the back of the car where Brown testified to being seated. Crime scene officers recovered 16 9 mm bullet casings, but only one .45 caliber bullet casing from the scene. The 9 mm casings included casings from the brands Blazer and Norma.

{¶ 31} Vesna Piscitello ("Piscitello") an analyst with the Cleveland Division of Police Real Time Crime Center, used the crime scene video to identify the car used in the shooting. She was able to determine that the car appeared to be a light colored 4-door sedan with an off-colored driver side door, dark rims on the front driver side, a chrome rim on the rear driver side, a sunroof, and the rear brake lights were partially illuminated. Piscitello also observed that the suspect vehicle fled the area southbound on East 76th Street and then westbound on Donald Avenue. Finally, she observed that two of the suspects were wearing white shirts in the video.

{¶ 32} Piscitello checked real-time cameras in the area to locate the car before and after the crime. She noted that the vehicle appeared to be an older Buick Lucerne, with a model year between 2006-2011. She could also see two of the passengers and identify they were wearing light-colored shirts. By running a search for that type of vehicle and registrations in the vicinity of the homicide, Piscitello located such a car registered to an address on Kimberly Avenue, where the suspect car was seen before and after the homicide. By searching vehicle records, Piscitello found that the vehicle was registered to Hinton and that one of Hinton's past addresses was on East 76th Street, the house across the street from where the homicide occurred. The home was owned by one of Hinton's relatives.

{¶ 33} Based on Piscitello's information, detectives were able to locate Hinton's car parked at the Kimberly Avenue address. Detectives found that the driver's side door had been recently spray-painted, because the paint was dripping off the door; the wheels had been rearranged, the front wheels had been put on the back of the car and the back wheels on the front. As a result, detectives obtained a warrant for the house and car and seized the car. During the search of the car, a live .45 caliber bullet was found when the rear driver's side seat was lifted.

{¶ 34} In addition to the foregoing, the State introduced evidence secured from search warrants executed at Lewis' home on Kimberly and his girlfriend's home on Durant Avenue. Police officers obtained a slew of weapons related evidence, including firearms, bullets, gun cartridges, and empty boxes for firearms and bullets. Specifically, police collected Blazer 9 mm bullets, which were the same

brand as some of the bullet casings collected at the crime scene. None of the evidence was linked to the crime scene evidence, via DNA, fingerprints, or ballistics. However, the State linked one of the weapons to Lewis because his DNA, along with the DNA of three unknown individuals, was found on one of the guns at his residence. At trial, the defense objected to the introduction of all weapons, ammunition, and DNA evidence, arguing that it was irrelevant, not probative to Lewis' guilt, and that any probative value was outweighed by the prejudice to the defense. The court overruled these objections.

{¶ 35} Furthermore, the State presented evidence that Lewis changed his appearance after the shooting. The State introduced a copy of Lewis' driver's license photo, which depicted him with long locs, piled high on his head, with some locs hanging over his foreheads. In the picture, some of Lewis' locs had been dyed red or fuchsia. While conducting the search warrant at Lewis' address on Kimberly Avenue, officers found a pile of hair cut or shaved from someone's head, which appeared to be locs, some dyed red or fuchsia.

{¶ 36} The jury ultimately found Lewis not guilty of the two counts of aggravated murder (Counts 1 and 6), but guilty of all remaining charges and associated firearm specifications. At the sentencing hearing, the trial court found that Counts 3 through 5, merged into Count 2, that Counts 8 through 10 merged into Count 7, and that Counts 12 and 13 merged into Count 11. The trial court imposed a sentence of 15 years to life on both murder charges (Counts 2 and 7), 11 to 16½ years on the attempted murder charge (Count 11), and five years on each of the discharge

of a firearm on or near prohibited premises charges (Counts 14, 15, and 16). The trial court ran Counts 14 through 16 concurrent to one another but consecutive to the remaining charges. The court also ran Counts 2, 7, and 11 consecutive to one another, for a total aggregate sentence of 46 years to 51½ years on the base charges. The trial court further imposed a three-year prison term on each of the three-firearm specifications associated with Counts 2, 7, and 11, and three-year and five-year terms on the firearm specifications associated with Count 14, to run consecutively and prior to the prison term on the underlying offenses for a total of 17 years. The total prison term was therefore 63 years to 68½ years in prison.

{¶ 37} The trial court issued a sentencing journal entry on October 18, 2024. The journal entry did not accurately reflect the sentence announced at the sentencing hearing because it did not run the base charges consecutively, additionally it imposed 31 years in firearms specifications rather than 17 years.

{¶ 38} On October 29, 2024, the trial court filed a "corrected" or nunc pro tunc journal entry. While that entry corrected some of the consecutive sentences to conform to the sentencing hearing, it did not change the prison term on the firearm specifications.

{¶ 39} Lewis filed his notice of appeal on October 30, 2024. Since the notice of appeal, the trial court has filed two additional nunc pro tunc sentencing entries to correct the sentence.

{¶ 40} Lewis raises the following errors on appeal.

## Assignment of Error No. 1

The trial court erred to the prejudice of Lewis, and denied his right to counsel, when it failed to conduct an evidentiary hearing on, and denied, Lewis' request for new counsel, which was premised on his appointed counsel's self-acknowledged conflict of interest arising from the grievance Lewis had filed against them with the local bar association, all in violation of Lewis' rights under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

## Assignment of Error No. 2

The trial court committed prejudicial error, and denied Lewis' rights to due process and a fair trial, by admitting substantial evidence of weapons and ammunition recovered in searches of the residences of Lewis and of his girlfriend, which had no connection to the subject murders on East 76th Street, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and Article I, Section 10 and 16, of the Ohio Constitution.

## Assignment of Error No. 3

The evidence at trial was constitutionally insufficient to support Lewis' convictions for any of the specifications for discharging a firearm from a motor vehicle as proscribed in R.C. 2941.146(A) and, in all events, the convictions on those specifications are against the manifest weight of the evidence.

**Law and Analysis**

**Lewis' Request for New Counsel**

{¶ 41} In his first assignment of error, Lewis challenges the trial court's decision to deny his request for new counsel without conducting an evidentiary hearing. Preliminarily, we note that although Lewis suggests that there was one motion, there were actually two separate motions. Although Lewis filed a pro se motion the month before trial, he did not make an additional motion to remove his counsel at trial. Rather, his lawyers asked to withdraw from the case once they

learned that Lewis had filed a grievance with CMBA. This posture poses three questions for this court. The first is whether the trial court properly denied Lewis' August 21, 2024 motion to remove his appointed counsel. The second is whether the trial court appropriately addressed the attorneys' motion to withdraw on the first day of trial. Finally, we must determine whether the trial court erred when it ruled without conducting a separate hearing or addressing Lewis directly. Based on a thorough review of the record and the applicable law, we find that the trial court did not err when it denied Lewis' and his counsels' motions. Additionally, the trial court conducted a thorough review of the underlying facts and had sufficient information to make its ruling such that addressing Lewis directly was not required.

## Standard of Review

{¶ 42} The trial court's decision to grant or deny a motion to remove appointed counsel is within its discretion, and therefore, we review the decision under the abuse of discretion standard of review. *State v. Nicholson*, 2021-Ohio-1300, ¶ 9 (8th Dist.), citing *e.g. State v. Pendergrass*, 2017-Ohio-2752, ¶ 16 (8th Dist.). Similarly, we review a trial court's decision to deny a lawyer's motion to withdraw as counsel under the abuse of discretion standard. *State v. Watts*, 2016-Ohio-8318, ¶ 8 (8th Dist.), citing *State v. Williams*, 2003-Ohio-4396, ¶ 135 (8th Dist.). A trial court abuses its discretion when its decision is "'unreasonable, arbitrary, or unconscionable.'" *State v. Nettles,* 2024-Ohio-4910, ¶ 22 (8th Dist.), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**Lewis' Motion to Remove Appointed Counsel**

**{¶ 43}** In his motion to remove appointed counsel, Lewis alleged that neither of his appointed lawyers had been communicating with him or contacting him about his case. He alleged that his lawyers had not shown him the evidence against him. Lewis also suggested that his lawyers were not zealously advocating on his behalf, and that they were not "taking proper lawful, and ethical measures that are required to vindicate [his] endeavors." As a result, Lewis was not confident in their representation of his interests at trial.

**{¶ 44}** A defendant has an inherent right to choose his own counsel "only in those cases wherein such accused is employing the counsel himself." *Thurston v. Maxwell*, 3 Ohio St.2d 92, 93 (1965). Further, "'an indigent defendant's right to counsel does not extend to counsel of the defendant's choice.'" *State v. Patterson*, 2014-Ohio-1621, ¶ 20 (8th Dist.), quoting *Thurston* at 93. A court may discharge court-appointed counsel, when the defendant shows "'good cause, such as a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict, which leads to an apparently unjust result.'" *State v. Frazier*, 2012-Ohio-1198, ¶ 27 (8th Dist.), quoting *State v. Pruitt*, 18 Ohio App.3d 50, 57 (8th Dist. 1984). Therefore, the defendant has the burden of establishing "proper grounds for the appointment of new counsel." *State v. Philpot*, 2022-Ohio-1499, ¶ 22 (8th Dist.), citing *Patterson* at ¶ 18. The defendant can meet this burden by demonstrating there exists "'"a breakdown in the attorney-client relationship of such magnitude as to jeopardize a defendant's right to effective assistance of counsel."'" *Id.,* quoting

*State v. Coleman*, 37 Ohio St.3d 286, 292 (1988), quoting *People v. Robles*, 2 Cal.3d 205, 215 (1970).

{¶ 45} Moreover, the Sixth Amendment right to counsel does not require the attorney and client to have a "rapport", nor does it require a "meaningful relationship" between the two. *State v. Drain*, 2022-Ohio-3697, ¶ 97, citing *State v. Henness*, 79 Ohio St. 3d 53, 65 (1997), quoting *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983). This means that "[h]ostility, tension or personal conflicts between an attorney and a client that do not interfere with the preparation of a competent defense are insufficient to justify a change in appointed counsel." *State v. Gordon*, 2002-Ohio-2761, ¶ 12 (1st Dist.), citing *Henness* at 65-66. Furthermore, a "[s]imple '[d]isagreement between the attorney and client over trial tactics and strategy does not warrant a substitution of counsel.'" *State v. Erwin*, 2010-Ohio-3022, ¶ 7 (10th Dist.), quoting *e.g.*, *State v. Furlow*, 2004 Ohio 5279, ¶ 12 (2d Dist.).

{¶ 46} Whether or not the trial court should directly address the defendant depends on the specificity of the allegations. The Ohio Supreme Court has held that when a defendant challenges the effectiveness and adequacy of his counsel and requests that the trial court replace his appointed counsel, "'it is the duty of the trial judge to inquire into the complaint and to make such inquiry a part of the record.'" *State v. Johnson*, 2006-Ohio-6404, ¶ 68, quoting *State v. Deal*, 17 Ohio St.2d 17 (1969), syllabus. However, this is a "limited judicial duty" that "'arises only if the allegations are sufficiently specific; vague or general objections do not trigger the duty to investigate further.'" *Id.*, quoting *State v. Carter*, 128 Ohio App.3d 419, 423

(4th Dist. 1998), citing *Deal* at 19.  No investigation is required for vague or general claims, and when an investigation is warranted, it may be "brief and minimal." *State v. Townsend*, 2012-Ohio-2919, ¶ 11 (8th Dist.), citing *State v. Harrison*, 2010-Ohio-2778, ¶ 39 (8th Dist.).  *See also State v. Hawkins*, 2009-Ohio-4368, ¶ 54 (8th Dist.) (defendant's statement that he felt his lawyers were "not going to fight for him to the fullest extent" was not "sufficiently specific" to warrant additional inquiry.); *State v. Michalos*, 2018-Ohio-4801, ¶ 29 (11th Dist.) (defendant's "vague and general accusations" that his lawyer was not "familiar" with the case did not trigger the trial court's duty to inquire further); *Parma v. Fonte*, 2013-Ohio-3804, ¶ 64 (8th Dist.) (defendant's request for new counsel because his lawyer did not like him was vague and did not warrant further inquiry).

{¶ 47} In his pro se motion to remove his counsel, Lewis argued:

> The reasons [for removal] . . . are, they have not been communicating with me, nor contacting me involving my case.  I don't have a feeling of confidence proceeding in trial with their counsel.  I have not been shown my discovery or all the evidence against me.  They are not pursuing matters on my behalf for this case.  I feel they are not taking proper lawful, and ethical measures that are required to vindicate my endeavors.  My attorneys are not acting with commitment and dedication to my interest.  Therefore, I would like to respectfully dismiss [counsel] from my pending case please and thank you.

{¶ 48} In response, the trial court emphasized that appointed counsel was actively engaged and knowledgeable about the case based on their performance at 17 pretrials.  In addition to the pretrials, the trial court noted that, at the request of counsel, the attorneys were given the opportunity to meet with Lewis in the courtroom on Friday afternoons to discuss the case as needed.  Based on these facts,

the trial court further noted that it did not observe any breakdown in communication between Lewis and his lawyers. To the contrary, the trial court found Lewis' contention that his lawyers were not contacting or communicating with him to be incorrect.

{¶ 49} Lewis did not raise specific facts to support his argument that his counsel were not acting on his behalf or taking lawful and ethical measures in his support. The trial court's review of the record, however, established diligent efforts were made by Lewis' attorneys to litigate the case. Finally, Lewis' lawyers described the relationship as follows, noting that

> I want to put on the record we have gone over this. [We, Lewis' lawyers,] have almost 60 years down here trying cases, and it's our understanding, your Honor, we have differing opinions between the clients and us regarding the case. [2] And if this case were to go forward, apparently it will go forward, it will be going forward against the advice of Defense counsel.

{¶ 50} Based on the foregoing, Lewis' allegations were not sufficiently specific to require further inquiry. While the better practice may have been for the trial court to address Lewis directly and inquire into his concerns, we cannot say that the trial court acted unreasonably, arbitrarily, or unconscionably under these facts and circumstances and find that the trial court's inquiry was sufficient. *See Fonte*, 2013-Ohio-3804, at ¶ 64; *Hawkins*, 2009-Ohio-4368, at ¶ 61.

{¶ 51} Accordingly, the trial court did not abuse its discretion when it solely addressed counsel before denying the motion.

---

[2] Counsel may have been referring to Lewis' mother who was in the courtroom, and/or other family members who met with the lawyers the day before trial.

## The Effect of Lewis' Decision to File a Grievance With CMBA

{¶ 52} Turning to the grievance Lewis filed with CMBA, Lewis waited until the first day of trial to notify his attorneys about the filing, despite evidence that he filed the grievance almost a month before trial. As a result, Lewis' attorneys immediately notified the trial court and argued that the filing in and of itself created a conflict of interest that required them to withdraw from the case. Lewis argues the trial court abused its discretion when it denied the motion. We disagree.

{¶ 53} The Sixth Amendment right to counsel "'includes a "correlative right to representation free from conflicts of interest."'" *State v. Davis*, 2025-Ohio-840, ¶ 8 (8th Dist.), quoting *State v. Williams*, 2021-Ohio-3152, ¶ 6, quoting *State v. Gillard*, 64 Ohio St.3d 304, 311 (1992). Our first responsibility in addressing a conflict-of-interest claim is determining whether "the trial court had a duty to investigate the potential conflict." *State v. Jackson*, 2023-Ohio-2381, ¶ 38 (8th Dist.). "[W]here a trial court knows or reasonably should know of an attorney's possible conflict of interest in the representation of a person charged with a crime, the trial court has an affirmative duty to inquire whether a conflict of interest actually exists." *Gillard* at 311.

{¶ 54} A "conflict of interest" is a term of art illustrating "'a situation in which regard for one duty tends to lead to disregard for another.'" *State v. Hope*, 2019-Ohio-2174, ¶ 107 (11th Dist.), quoting *State v. Manross*, 40 Ohio St.3d 180, 182 (1988). "'The possibility of a conflict of interest exists when counsel has reason to further or serve interests that are different from those of his client.'" *Jackson* at

¶ 38*, quoting* Solon v. Depew, 2023-Ohio-304, ¶ 19 (8th Dist.), citing *State ex rel. Ogle v. Hocking Cty. C.P.*, 2021-Ohio-4453, ¶ 23. The typical conflict of interest case involves an attorney representing two or more defendants for the same crime or crimes. However, where, as here, dual representation is not the issue,

> "[t]he critical inquiry instead is whether the defendant demonstrated that counsel actively represented conflicting interests, and secondly, whether the defendant demonstrated that the actual conflict of interest adversely affected [the] lawyer's performance."

*State v. Candelario*, 2025-Ohio-105, ¶ 5 (8th Dist.), quoting *State v. Nikolic*, 1991 Ohio App. LEXIS 5473, *4 (8th Dist. Nov. 14, 1991), citing *e.g.*, *Burger v. Kemp*, 483 U.S. 776, 783 (1987).

{¶ 55} Further, the defendant must establish an ""'actual conflict . . . [that] adversely affected his lawyer's performance.'"" *Hope* at ¶ 108, quoting *State v. Getsy*, 84 Ohio St.3d 180, 187 (1998), quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). The existence of a possible conflict of interest is insufficient. *State v. Penland*, 2023-Ohio-806, ¶ 78 (8th Dist.), citing *Getsy* at 187.

{¶ 56} Thus, we must determine whether Lewis' CMBA grievance amounts to an actual or possible conflict of interest. At least one Ohio court has found that "[t]here is no legal authority holding that a defendant's filing of a grievance against his counsel automatically creates an actual conflict of interest." *Hope* at ¶ 122. Rather, a defendant's decision to file a grievance suggests a possible conflict of interest. *Id.* A number of federal courts have addressed this issue:

> [I]f the filing of State-bar grievances was in itself sufficient to create a conflict of interest that would prevent attorneys from providing

effective representation, then criminal defendants could habitually abuse this rule. Any defendant in a criminal case would be able to manufacture a frivolous argument against his or her attorney, file a State-bar grievance, and have the district court substitute new counsel. *See, United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993) (noting that a ruling for a defendant claiming ineffective assistance of counsel as a result of a meritless State-bar grievance "would invite criminal defendants anxious to rid themselves of unwanted lawyers to queue up at the doors of bar disciplinary committees on the eve of trial").

And even if the grievances in question here had merit, they did not create a conflict of interest because the grievances did not establish any competing obligations for the attorneys. If anything, they aligned the attorneys' interests with those of their clients and incentivized the attorneys to work even harder. The attorneys must have recognized that if their clients were convicted at trial, the alleged failure to pursue the speedy-trial objections would be highlighted. They must have similarly recognized that an acquittal for their clients would render the grievances moot. *See*, *e.g.*, *United States v. Leggett*, 81 F.3d 220, 227, 317 U.S. App. D.C. 125 (D.C. Cir. 1996) ("[A]n attorney fearing an ineffective assistance of counsel claim has an incentive to do his best, not the contrary.").

*United States v. Gandy*, 926 F.3d 248, 261 (6th Cir. 2019).

{¶ 57} *See also In re Toney*, 2012 Bankr. LEXIS 2265, *3 (Bankr. N.D. Ohio 2012) ("The filing of a grievance by a client against his attorney does not create a per se conflict of interest between the attorney and client.); *Brown v. United States*, 2022 U.S. App. LEXIS 1594, *14 (6th Cir. Jan. 19, 2022), quoting *Wilson v. Rogers*, 1997 U.S. App. LEXIS 27829, *3 (6th Cir. Oct. 3, 1997) ("[C]ourts have held that the filing of grievances alleging deficient performance does not create a conflict of interest because 'an attorney fearing an ineffective assistance of counsel claim has an incentive to do his best, not the contrary.'").

{¶ 58} We find this case law persuasive; Lewis has not shown that the grievance created an actual conflict of interest.

{¶ 59} In this case, Lewis' lawyers first raised the existence of the grievance on the first day of trial. Although they argued that a conflict of interest existed "based on case law," they did not cite to any authority and asked for a one-day continuance to investigate further. Because there was no other information aside from concerns that a grievance had been filed, the trial court denied the motion. The following day, after confirming the grievance, the defense argued that "now we, . . . the Defense, have an adversarial relationship with our client which prevents us from going forward with this trial."

{¶ 60} When the trial court asked the defense what had changed and why the court should not view this as a stalling tactic given that Lewis had failed to disclose this information for more than 24 days, counsel responded that the nature of the grievance was private until resolved. When the trial court inquired further and asked counsel to identify the conflict of interest, the defense identified "[t]he grievance" and advised "I don't know what the grievance says. That is why we are asking for a continuance." When it became clear that the sole basis for the attorneys' concern was the unknown grievance, the court specifically noted,

> If this is all it took to send one of these notes over there and file it —
> We've already seen stalling tactics here in this case and attempts to
> dupe the Court to stall the record and obstruct the procedure, the
> ongoing trial. If this is all it took, we would be flooded with these
> letters.

{¶ 61} Looking at the entire record, it is clear that Lewis disagreed with his lawyers' advice regarding whether to accept a plea deal or to proceed to trial. The grievance, in that context, was a last-ditch effort on his part to have counsel removed. However, as the trial court noted, the grievance, in and of itself, was insufficient to establish a conflict of interest. To the contrary, Lewis' attorneys were very experienced and confident in their analysis of the case despite Lewis' lack of confidence in their trial strategy. Further, there was no evidence of a deterioration in the relationship between Lewis and his attorneys. The attorneys represented that the day before trial, they arranged to meet with Lewis, his mother, and sister to discuss the case. While Lewis did tell his lawyers that he was unwilling to work with them, he did so for the first time on the second day of trial when it was clear that the trial court was unwilling to grant a continuance or remove counsel. The trial court then went through an exhaustive breakdown of the attorneys' work on the case and the absence of any evidence that Lewis and his lawyers were unable to work with one another. Accordingly, Lewis fails to establish that the grievance itself caused a conflict of interest that would impact his attorneys' performance.

{¶ 62} In an attempt to bolster his argument, Lewis argues that there is a "typical statewide practice" of appointing new counsel when a defendant has filed a grievance or expressed such a strong hostility to his appointed counsel. Lewis claims that, as a result, the trial court erred when it failed to follow this practice. However, none of the cases cited by Lewis establish a "statewide practice." In *State v. Willis*, 2019-Ohio-537, ¶ 35-37 (8th Dist.); *State v. Sandridge*, 2015-Ohio-1541, ¶ 18 (8th

Dist.); *State v. Freeman*, 2010-Ohio-1357, ¶ 8, 12, 13 (6th Dist.); *State v. Dinger*, 2022-Ohio-608, ¶ 7 (5th Dist.); and *State v. Newman*, 2018-Ohio-3253, ¶ 7-8 (5th Dist.), the trial courts utilized their discretion to grant motions to withdraw as counsel after the defendant filed a grievance. However, on appeal, the defendants did not challenge that decision; therefore, the issue was not subject to review.

{¶ 63} The fact that trial courts, in the exercise of their discretion, might grant motions to withdraw as counsel after the filing of a grievance does not create precedent that every trial court must then follow. Rather, trial courts are bound by precedent set by *higher* reviewing courts. *See, e.g., Young v. UC Health, W. Chester Hosp., LLC*, 2016-Ohio-5526, ¶ 29 (1st Dist.); *State v. Kendall*, 2007-Ohio-5656, ¶ 13 (10th Dist.). Furthermore, "'neither the trial court nor this court is bound to follow trial court decisions on the same issue involving different parties.'" *Miller v. Rice Drilling D LLC*, 2023-Ohio-3588, ¶ 15, fn.2 (7th Dist.), quoting *Henderson v. Haverfield*, 2022-Ohio-2194, ¶ 79 (7th Dist.).

{¶ 64} In the final two cases cited by Lewis, *State v. Hamilton*, 1992 Ohio App. LEXIS 2141, *4-5 (3d Dist. Mar. 31, 1992), and *State v. Graves*, 1999 Ohio App. LEXIS 5992, *7 (9th Dist. Dec. 15, 1999), the appellate courts ultimately upheld the trial court's decision to deny motions to withdraw as counsel where, respectively, the court had reviewed the reasons with the parties and found them insufficient to grant the motion, and where the court found that the last minute request was not supported by proper grounds for relief. Therefore, the cases do not support Lewis' argument.

{¶ 65} Finally, Lewis fails to cite any place in the record where the alleged conflict of interest affected his lawyers' performance at trial. To the contrary, Lewis argues that if he had a better relationship with his lawyers, he may have accepted the State's offer, which would have led to him pleading guilty to two counts of murder, one count of attempted murder, and the three-year firearm specifications on each. However, as noted above, a defendant is not guaranteed a rapport or a meaningful relationship with his lawyers. *Drain*, 2022-Ohio-3697, at ¶ 97. The fact that Lewis and his lawyers disagreed on the best resolution for his case does not demonstrate a conflict of interest that compromised his lawyers' ability to represent him. Lewis had every right to disregard his lawyers' advice to accept the plea deal. Without more, that disagreement regarding strategy does not establish a conflict of interest warranting removal of counsel. *Erwin*, 2010-Ohio-3022, at ¶ 7. Because the record does not reveal an actual conflict of interest, the trial court did not abuse its discretion when it denied the attorneys' request to withdraw. Furthermore, because there was no conflict of interest, the trial court was not required to conduct an inquiry into the grievance.

{¶ 66} Accordingly, the first assignment of error is overruled.

**Weapons Evidence**

{¶ 67} In his second assignment of error, Lewis argues that the trial court erred and abused its discretion when it allowed the introduction of weapons and ammunition evidence that was unrelated to the crime, lacked relevance, and was highly prejudicial to him in violation of his rights under the Fifth, Sixth, and

Fourteenth Amendments to the U.S. Constitution and Article I, Sections 10 and 16, of the Ohio Constitution.

## Standard of Review

{¶ 68} The decision whether to admit or exclude evidence rests in the sound discretion of the trial court. *State v. Harris*, 2022-Ohio-4630, ¶ 41 (8th Dist.), citing *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). We will not overturn the trial court's decision absent an abuse of discretion. *State v. Payne,* 2019-Ohio-4158, ¶ 38 (8th Dist.). In other words, we will uphold the trial court's ruling unless it was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

## Other Acts Evidence

{¶ 69} Under Evid.R. 404(B) and R.C. 2945.59, evidence of other acts "to prove a character trait in order to demonstrate conduct in conformity with that trait" or "to show the accused's propensity or inclination to commit crime" is inadmissible. *State v. Williams*, 2012-Ohio-5695, ¶ 15-16. "[I]ntroduction of other weapons evidence – i.e., irrelevant evidence of weapons unrelated to the charges" is error. *State v. Thomas*, 2017-Ohio-8011, ¶ 36. "Evidence that a person carries a gun is the type of 'other acts' evidence, which is generally inadmissible since it portrays the person as a violent individual who regularly carried guns." *State v. Robinson*, 2007-Ohio-3501, ¶ 55 (7th Dist.), citing *State v. Carusone,* 2003-Ohio-1018, ¶ 30, 98 (1st Dist.).

{¶ 70} When other weapons evidence is introduced, it can fall into two categories: "harmless error or prejudicial error requiring reversal." *Thomas* at ¶ 38. Harmless error occurs when there is overwhelming independent evidence of guilt. *Id.* at ¶ 39. However, "[w]hen the other weapons evidence 'leads only to inferences about matters that were not properly provable in this case, i.e., the defendant's dangerous character,' admission of that evidence prejudices the accused and is reversible error." *Thomas* at ¶ 41, quoting *Walker v. United States*, 490 F.2d 683, 684-685 (8th Cir.1974).

{¶ 71} In the instant case, the State introduced numerous pictures from two search warrants; one executed at Lewis' home a couple of weeks after the incident, the other at his girlfriend's home five months after the incident. None of the evidence was directly connected to the crime at issue. The only real connection acquired from the search warrants was that in Lewis' home, there was a 50-count box of Blazer 9 mm bullets that was almost empty, the same brand of bullets as the casings found at the scene. The State also introduced evidence that Lewis' DNA was on a 9 mm firearm, a weapon that was not used in the commission of the underlying crimes and included DNA from three unknown people.

{¶ 72} Notably, the State argued at trial and on appeal that they introduced this evidence to establish that the police conducted a thorough investigation. It is hard to believe that the State needed to introduce over 400 pictures, many of which were repeat images of weapons, bullets, empty gun cases, and empty boxes of ammunition, to establish a thorough investigation. Certainly, there were multiple

instances in the record where the defense was able to highlight that none of the evidence linked Lewis to the crime. Nonetheless, we find the introduction of the weapons evidence, under the circumstances, was erroneous.

{¶ 73} If the admission of the evidence was error, the State further argued that the error was harmless. For the error to be harmless, we must consider whether there was overwhelming evidence of guilt. "'Overwhelming evidence of guilt' is evidence that clearly demonstrates guilt beyond a reasonable doubt." *State v. Croskey*, 2019-Ohio-2444, ¶ 21 (8th Dist.). "[W]hether the alleged error was prejudicial depends on the strength and amount of independent evidence against the defendant." *State v. Sims*, 2021-Ohio-1296, ¶ 70 (8th Dist.).

{¶ 74} In the instant case, there was overwhelming evidence of Lewis' guilt. First, there was the video of the homicide. Although the video was not clear enough to recognize faces, both Hinton and Brown provided testimony that if believed identified Lewis as the shooter.

{¶ 75} Furthermore, Piscitello's work identified Hinton's car as the car seen in the video of the incident. Piscitello's report and testimony served to corroborate Hinton's testimony that he drove his car to both Kimberley Avenue and East 76th Street on the night of the homicide. Based on Piscitello's information, detectives were able to locate Hinton's car parked at the Kimberly Avenue address. Detectives found that someone had attempted to disguise the vehicle by painting the driver's side door and changing the positions of the tires, evidence that further corroborated Hinton's testimony.

{¶ 76} Lewis further challenges the evidence against him by claiming that both Hinton's and Brown's testimony was unreliable because they both had motivation to lie. The credibility of Hinton and Brown was in the province of the jury. Notably, Hinton's original statement was provided without benefit of a plea deal. The State acknowledged the existence of plea deals when it presented Hinton's and Brown's testimony. The defense cross-examined both vigorously and pointed out they had motive to lie. Moreover, Hinton's and Brown's testimony was corroborated by the video of the shooting. Just like Hinton and Brown stated, the video evidence established that there was one primary shooter. The video also corroborated Hinton's testimony that he exited the driver's seat of his car; pointed a gun at the shooter, who he identified as Lewis; and never fired a shot. The video further corroborated Brown's testimony that he was in the back seat of Hinton's vehicle, did not interact with the women, and fired one shot out of the rear of the vehicle as Hinton was driving away.

{¶ 77} Finally, there was evidence that Lewis attempted to disguise his appearance after the shooting by cutting off his locs as evidenced by his driver's license picture, with full locs, and the shaved hair on the floor of his residence when the police conducted the search warrant after the shooting.

{¶ 78} Although it was error for the trial court to admit other weapons evidence, that error was harmless because there was overwhelming evidence of Lewis' guilt beyond a reasonable doubt.

{¶ 79} Accordingly, the second assignment of error is overruled.

**Manifest Weight and Sufficiency of Evidence**

{¶ 80} Finally, in the third assignment of error, Lewis challenges his convictions under R.C. 2941.146(A), the five-year firearm specification. The State concedes that it was error for the trial court to impose the five-year arm specification on a violation of R.C. 2923.162(A)(3); however, the State argues that the convictions on the remaining counts under R.C. 2941.146(A) were supported by sufficient evidence. For ease of analysis, we will address the convictions on Counts 14 through 16 first, then address the convictions with respect to Counts 2 through 6, and 8 through 13.

**Standard of Review**

{¶ 81} Lewis challenges both the sufficiency and the weight of the evidence presented to support a conviction on the five-year firearm specification. A challenge to the sufficiency of the evidence asks whether the State has met its burden of production. *State v. Tate*, 2024-Ohio-5319, ¶ 40 (8th Dist.), citing *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). "'[T]he relevant inquiry is whether; after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 82} In contrast, a challenge to the weight of the evidence concerns "the evidence's effect of inducing belief." *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997). The reviewing court must

consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine ""whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.""" *State v. Harris*, 2021-Ohio-856, ¶ 32 (8th Dist.), quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983).

**Five-Year Firearm Specifications Attached to Counts 14–16**

{¶ 83} As we have noted, the State concedes it was error for the trial court to impose a sentence on the five-year firearm specifications attached to Counts 14 through 16. A notice of conceded error "is not controlling," and an appellate court must still independently review the alleged error. *State v. Alexander-Keels*, 2024-Ohio-3138, ¶ 17 (6th Dist.), citing *State v. Strange*, 2024-Ohio-2199, ¶ 8 (6th Dist.), citing *State v. Hermes*, 2023-Ohio-2011, ¶ 26 (6th Dist.).

{¶ 84} In order to establish guilt for a violation of R.C. 2941.146(A), the State must establish that the offender either (1) committed a violation of R.C. 2923.161, improperly discharging a firearm at or into a habitation; or (2) committed "a felony that includes, as an essential element, purposely or knowingly causing or attempting to cause the death of or physical harm to another and that was committed by discharging a firearm from a mother vehicle other than a manufactured home."

{¶ 85} Here the trial court imposed the five-year firearm specification on a violation of R.C. 2923.162(A)(3), which requires proof that the offender discharged a firearm upon or over a public road or highway. However, this court has found that

a violation of R.C. 2923.162(A)(3) is a strict liability offense and, therefore, it has no culpable mental state, such as purposeful or knowing. *State v. James*, 2015-Ohio-4987, ¶ 33 (8th Dist.).

{¶ 86} Given the facts of this case, R.C. 2923.161 does not apply as it requires discharging a firearm at or into a habitation. Additionally, this court has previously found that the five-year firearm specification does not apply to violations of R.C. 2923.162(A) because it is not "a felony that includes, as an essential element," purposeful or knowing conduct. *State v. Wilson*, 2023-Ohio-1042, ¶ 49 (8th Dist.); *State v. Maldonado*, 2021-Ohio-1724, ¶ 17 (8th Dist.). Therefore, there was insufficient evidence to support the finding of guilty to the five-year firearm specification attached to Counts 14 through 16. Accordingly, we sustain the third assignment of error with respect to Counts 14 through 16 and we need not consider the challenge to the weight of the evidence. *See State v. Hardman,* 2016-Ohio-498, ¶ 35 (8th Dist.) ("if the evidence is insufficient, regardless of whether we review the arguments for prejudicial error or plain error, the conviction must be reversed." (Citations omitted.))

**Five-Year Firearm Specifications on Counts 2-5, 7-13**

{¶ 87} Lewis also challenges the sufficiency and weight of the evidence on the five-year firearm specifications associated with the remaining counts. Preliminarily, because the trial court merged charges and neither party challenges the merger, we limit our review to the five-year firearms specifications attached to Counts 2, 7, and

11. R.C. 2941.25(A).[3] However, the trial court did not impose a sentence on any of those charges. The trial court was required to impose a five-year firearm specification under R.C. 2941.146(A) if the elements of that offense were met. R.C. 2929.14(B)(1)(c).[4] The trial court's failure to impose that sentence on one of the remaining charges was an error that either party could have raised on direct appeal. *State ex rel. Rodriguez v. Barker*, 2019-Ohio-4155, ¶ 9 ("court's error in failing to address the aggravated-robbery firearm specification in its entry is a sentencing error that Rodriguez could have appealed"). Failure to raise the issue waives appellate review absent a showing of plain error.

{¶ 88} Nevertheless, it is well settled that "[a] sentence that fails to impose a mandatory provision is contrary to law." *State v. Dowdell*, 2022-Ohio-2956, ¶ 8 (8th Dist.), citing *State v. Underwood*, 2010-Ohio-1, ¶ 21. Further, even though the State did not raise this error, "a sentence imposed contrary to law constitutes plain error and we may review it for plain error." *Id.* at ¶ 9, citing *State v. Whittenburg*,

---

[3] R.C. 2941.25(A) holds: Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

[4] "[I]f an offender who is convicted of or pleads guilty to a . . . felony that includes, as an essential element, purposely or knowingly causing or attempting to cause the death of or physical harm to another, also is convicted of or pleads guilty to a specification of the type described in division (A) of section 2941.146 of the Revised Code that charges the offender with committing the offense by discharging a firearm from a motor vehicle other than a manufactured home, the court, after imposing a prison term on the offender for the violation . . . for the other felony offense under division (A), (B)(2), or (B)(3) of this section, shall impose an additional prison term of five years upon the offender that shall not be reduced pursuant to section 2929.20, division (A)(2) or (3) of section 2967.193 or 2967.194, or any other provision of Chapter 2967 or Chapter 5120 of the Revised Code."

2022-Ohio-803, ¶ 6 (8th Dist.), citing *State v. Walters*, 2016-Ohio-5783, ¶ 2 (4th Dist.); *State v. Ayers*, 2014-Ohio-276, ¶ 15 (10th Dist.). Based on the foregoing, once the jury found Lewis guilty of the five-year firearm specifications associated with Counts 2, 7, and 11, the trial court's failure to impose a prison term for the specification on one of those three counts was plain error.

{¶ 89} Accordingly, we must consider Lewis' challenge that the findings of guilty were not supported by the sufficiency and manifest weight of the evidence.

{¶ 90} Lewis' sole challenge to the sufficiency of the evidence alleges that there was no evidence that Lewis was in a car when he fired his gun; therefore, there was insufficient evidence presented to support his convictions. Additionally, because there was insufficient evidence, Lewis argues that the jury must have lost its way when it found him guilty of the specification.

{¶ 91} The Ohio Supreme Court has explicitly held that "R.C. 2941.146 is not applicable when a person fires a weapon while standing completely outside a motor vehicle." *State v. Swidas*, 2012-Ohio-4638, ¶ 1. In *Swidas*, the Court found that the operative question was the shooter's location at the time of the shooting. *Id*. at ¶ 23. Where there was evidence that the defendant shot with both feet planted on the ground and had no substantial physical connection with the car, the evidence was insufficient to establish a violation of R.C. 2941.146. *Id*. at ¶ 26.

{¶ 92} However, the Ohio Supreme Court has also recognized that a defendant is subject to the sentencing enhancement created under a firearm specification if he is the principal actor or an unarmed accomplice. *State v.*

*Humphries*, 2014-Ohio-1230, ¶ 18 (8th Dist.), citing *State v. Chapman*, 21 Ohio St.3d 41, 42-43 (1986), citing *State v. Howard*, 2012-Ohio-3459, ¶ 24 (8th Dist.) ("It is well settled that an unarmed accomplice can be convicted of an underlying felony, together with a firearm specification, based on an aider and abettor status."). A person acting in complicity with another may be charged as the principal offender. *Chapman* at 42. A person acts in complicity when they act "with the kind of culpability required for the commission of an offense" and they "aid or abet another" in committing the offense. R.C. 2923.03(A)(2).

{¶ 93} Based on the facts of this case where R.C. 2923.161 does not apply, the State was required to establish that Brown (1) committed a felony that includes, as an essential element, purposely or knowingly causing or attempting to cause the death of or physical harm to another and (2) that was committed by discharging a firearm from a motor vehicle other than a manufactured home. The evidence reflects that D.S. saw the long barrel of a gun pointing out of the window from the back seat where Brown admitted he was seated. Furthermore, Brown admitted firing one shot through the window. Although he denied aiming at anyone, he testified that he fired his gun in response to people he believed were shooting at them. The video of the incident confirms that one shot was fired from the backseat of the car as Hinton was driving away. Firing a weapon "'into an area without knowledge of its occupants is sufficient to establish a knowing attempt to cause physical harm for the purpose of a felonious assault conviction.'" *State v. Jeffers*, 2025-Ohio-989, ¶ 54 (2d Dist.), quoting *State v. Moore*, 2022-Ohio-3756, ¶ 48 (2d

Dist.), citing *State v. Hill*, 2020-Ohio-1237, ¶ 19-20 (6th Dist.); *State v. Elko*, 2004-Ohio-5209, ¶ 54 (8th Dist.), *overruled in part on other grounds, State v. Ford*, 128 Ohio St. 3d 398; *State v. Ivory*, 2004-Ohio-2968, ¶ 6 (8th Dist.). Based on the foregoing, there was sufficient evidence presented, if believed, that Lewis, acting in complicity with Brown, knowingly caused or attempted to cause physical harm to another by discharging a firearm from a motor vehicle.

{¶ 94} With respect to the weight of the evidence, Lewis did not consider complicity and did not pose any facts to counter the jury's finding. He merely argued that because he was not in the car at the time of the shooting, the jury should not have found him guilty. However, the record reflects that the jury was instructed on complicity and the uncontested testimony established that Lewis was complicit in Brown's conduct of firing a weapon from Hinton's car. Therefore, the convictions were supported by the greater weight of the evidence.

{¶ 95} Based on the foregoing, we remand the case to the trial court for the limited purpose of holding a sentencing hearing to impose the five-year firearm specification on an applicable count pursuant to statute.

**Jurisdiction**

{¶ 96} Finally, we must address the trial court's nunc pro tunc orders correcting the sentence. "A trial court lacks the authority to reconsider its own valid, final judgment in a criminal case, with two exceptions: (1) when a void sentence has been imposed and (2) when the judgment contains a clerical error." *State v. Miller*, 2010-Ohio-5705, ¶ 14, citing *State ex rel. Cruzado v. Zaleski,* 2006-Ohio-5795, ¶ 19.

A trial court has authority "to correct 'clerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission at any time.'" *State v. Johnson*, 2024-Ohio-1371, ¶ 7 (8th Dist.), quoting Crim.R. 36.

{¶ 97} However, "'once an appeal is perfected, the trial court is divested of jurisdiction over matters that are inconsistent with the reviewing court's jurisdiction to reverse, modify, or affirm the judgment.'" *State v. Aarons*, 2021-Ohio-3671, ¶ 20 (8th Dist.), quoting *Tomorrow v. Cuyahoga County Court of Common Pleas*, 2011-Ohio-626, ¶ 13, quoting *State ex rel. Rock v. Sch. Emples. Ret. Bd.*, 2002-Ohio-3957, ¶ 8. "[G]enerally, the timely filing of a notice of appeal precludes a trial court from issuing further orders affecting matters at issue in the appeal. Where a trial court enters an order without jurisdiction, its order is void and a nullity." *Id.* at ¶ 20, citing *State v. Williamson*, 2014-Ohio-3909, ¶ 18 (8th Dist.), citing *State v. Abboud*, 2006-Ohio-6587, ¶ 13 (8th Dist.).

{¶ 98} Here, the trial court's two nunc pro tunc orders filed after Lewis' notice of appeal directly related to and affected matters assigned as error in this appeal, namely the sentence. Therefore, the trial court's November 15, 2024, and November 20, 2024 nunc pro tunc sentencing entries were inconsistent with this court's jurisdiction to reverse, modify, or affirm the trial court's judgment and are therefore void. *See Aarons* at ¶ 24.

{¶ 99} However, we are mindful that the trial court's October 29, 2024 sentencing entry, issued just prior to the filing of the notice of appeal, does not comport with the sentence announced at the sentencing hearing. While the trial

court lacked jurisdiction to file the nunc pro tunc entries while the case was pending in the court of appeals, it retains authority to file a nunc pro tunc to correct clerical errors in its sentencing entry at any time after the case is remanded to the trial court. *See State v. Anderson*, 2024-Ohio-3118, ¶ 35 (1st Dist.); *State v. Donley*, 2017-Ohio-562, ¶ 173 (2d Dist.).

{¶ 100} Accordingly, the trial court lacked jurisdiction to issue the two post-appeal nunc pro tunc entries while the case was pending in the court of appeals and those entries are void and vacated.

{¶ 101} Judgment affirmed in part and reversed in part. Case remanded to the trial court for the limited purpose of resentencing Lewis on the five-year firearm specification as mandated by statute. Additionally, the trial court is instructed to correct the remainder of the sentencing entry to comport with the sentence imposed in open court.

It is ordered that costs are divided equally between the parties.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, PRESIDING JUDGE

ANITA LASTER MAYS, J., and
DEENA R. CALABRESE, J., CONCUR